## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

THOMAS MARTIN,

        Plaintiff,

vs.                                                                    No. CIV 20-0749 JB/JHR

ARIZONA PUBLIC SERVICE COMPANY,

        Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Defendant's Motion for Summary Judgment, filed March 15, 2021 (Doc. 22)("MSJ").  The Court held a hearing on May 24, 2021.  See Clerk's Minutes at 1, filed May 24, 2021 (Doc. 38).  The primary issues are: (i) whether Defendant Arizona Public Service Company ("APS") fired Plaintiff Thomas Martin because of Martin's age; (ii) whether APS retaliated against Martin, because Martin complained that APS employees were discriminating against him on the basis of his age; (iii) whether APS fired Martin, because Martin reported workplace safety concerns; and (iv) whether Martin is entitled to back pay and front pay, because he attempted to find alternate employment.  The Court concludes: (i) APS did not fire Martin because of Martin's age; (ii) APS did not retaliate against Martin for making an age-discrimination complaint; (iii) APS did not retaliate against Martin for reporting safety concerns; and (iv) Martin failed to mitigate his damages.  The Court, therefore, will grant the MSJ.

## FACTUAL BACKGROUND

This case arises from APS terminating Martin's employment on September 20, 2018.  See Memorandum in Support of Defendant's Motion for Summary Judgment ¶ 53, at 9, filed March 15, 2021 (Doc. 23)("MSJ Memo").  The Court takes it facts from the MSJ Memo; the Plaintiff's

Response in Opposition to Defendant's Motion for Summary Judgment, filed April 12, 2021 (Doc. 26)("Response"); and the Defendant's Reply to its Motion for Summary Judgment, filed May 10, 2021 (Doc. 32)("Reply").   Most of the facts are undisputed.   The Court states the undisputed material facts in the text.   See Fed. R. Civ. P. 56.   Facts that are disputed are specifically noted in the footnotes.

    1.    **Background**.

APS "generates, sells, and delivers electricity and energy-related products and services to customers in the southwestern United States."   MSJ Memo ¶ 1, at 1 (asserting this fact).   See Declaration of Stacey Micatrotto ¶ 3, at 1, filed March 15, 2021 (Doc. 23-1)("Micatrotto Decl."); Response at 1 (admitting this fact).   APS is one of five co-owners, but the sole operator, of the Four Corners Power Plant ("Four Corners"), a 2-unit, 1,540 megawatt powerplant in Fruitland, New Mexico.   MSJ Memo ¶ 1, at 1 (asserting this fact).   See Micatrotto Declaration ¶ 3, at 1; Response at 1 (admitting this fact).   APS' Performance Management Procedure sets out APS' expectations for its employees and the roles that its employees play in employee performance reviews.   See MSJ Memo ¶ 3, at 1 (asserting this fact); APS Procedure: Performance Management at 11-14, filed March 15, 2021 (Doc. 23-1)("APS Perf. Proc."); Response at 1 (admitting this fact). Under APS' Performance Management Procedure, APS employees undergo yearly performance evaluations, where "employees' leaders rate employee performance on a scale of '1' to '5,' with '5' being the highest rating possible and '1' being the lowest."   MSJ Memo ¶ 3, at 1-2 (asserting this fact).   See APS Perf. Proc. at 11-14; Response at 1 (admitting this fact).   APS employees who do not meet job expectations or do not meet APS' required performance standards are subject to coaching, discipline, a Performance Improvement Plan ("PIP"), "or a combination of all three." MSJ Memo ¶ 4, at 2 (asserting this fact).   See APS Coaching, Performance Improvement Plans

and Discipline Procedure at 16-20, filed March 15, 2021 (Doc. 23-1)("APS Coaching Proc.");
Response at 1 (admitting this fact).  APS may terminate employees who do not improve their
behavior or job performance.  See MSJ Memo ¶ 4, at 2 (asserting this fact); APS Coaching Proc.
at 16-20; Response at 1 (admitting this fact).

Martin began to work at APS on January 2, 2007, as a Maintenance Technician at Four
Corners.  See MSJ Memo ¶ 5, at 2 (asserting this fact).  See APS Dates of Hire/Termination Form
for Thomas W. Martin at 22, filed March 15, 2021 (Doc. 23-1)("Martin Hire Form"); Response at
1 (admitting this fact).  APS promoted Martin to an "Instructor II position" on August 8, 2014.
MSJ Memo ¶ 6, at 2 (asserting this fact).  See Transcript of Deposition of Thomas Martin, taken
February 10, 2021, at 27:7-25, filed March 15, 2021 (Doc. 23-1)("Martin Depo."); Response at 1
(admitting this fact).  After Martin was promoted, Alejandro Ortiz was his supervisor, and Thomas
Fore was his manager.  See MSJ Memo ¶ 6, at 2 (asserting this fact); Martin Depo. at 27:7-25;
Response at 1 (admitting this fact).  In his new position as an Instructor II, Martin helped to train
the mechanical maintenance staff at Four Corners, created training plans, worked alongside "front
line employees on skills they needed for their jobs," and "trained operations staff."  MSJ Memo
¶ 7, at 2 (asserting this fact).  See Martin Depo. at 28:21-29:25; id. at 31:3-32:1; Job Description,
dated January 14, 2019, at 64-66, filed March 15, 2021 (Doc. 23-1); Response at 1 (admitting this
fact).

2.      **The Lathe Incident.**

In May, 2015, Martin instructed APS employees how to use a lathe.[1]  See MSJ Memo ¶ 8,

---

[1]A lathe is a "machine tool that rotates a workpiece about an axis of ration to perform
various operations such as cutting, sanding, knurling, drilling, deformation, facing, and turning,
with tools that are applies to the workpiece to create an object with symmetry about that axis."
Wikipedia Lathe, https://en.wikipedia.org/wiki/Lathe (last visited December 29, 2021).

at 2 (asserting this fact); Martin Depo. at 12:11-16:22; id. at 20:19-21:7.[2]  Martin knew that APS

policy was that lathes could not be used without safety guards.  See MSJ Memo ¶ 8, at 2 (asserting

this fact); Martin Depo. at 12:11-16:22; id. at 20:19-21:7.[3]  Some of the parts would not fit on the

lathe, however, unless the guards were removed.  See Response at 2 (asserting this fact); Martin

Depo. at 11:7-25; id. at 12:1-25; id. at 13:1-25; id. at 14:1-13.[4]  Martin, therefore, told his trainees

that they could use the lathe without a shield if they first asked their supervisor.  See MSJ Memo

¶ 9, at 2 (asserting this fact); Martin Depo. at 39:21-42:17.[5]  Before Martin instructed John Gravlin

on the procedures to follow before attempting to use a lathe without a guard, Gravlin used a lathe

without a guard, "got caught up in the machine," and "almost died."  MSJ Memo ¶ 10, at 3

(asserting this fact).  See Martin Depo. at 12:11-14:13 (asserting this fact).[6]  APS investigated

---

[2]In his Response, Martin does not respond to this asserted fact.  See Response at 2.  The
Court, therefore, deems this fact undisputed.  See D.N.M. LR-Civ 56.1(b)("All material facts set
forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[3]In his Response, Martin does not respond to this asserted fact.  See Response at 2.  The
Court, therefore, deems this fact undisputed.  See D.N.M. LR-Civ 56.1(b)("All material facts set
forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[4]In the Reply, APS does not respond to this asserted fact.  See Reply at 2.  The Court,
therefore, deems this fact undisputed.  See D.N.M. LR-Civ 56.1(b)("All material facts set forth in
the response will be deemed undisputed unless specifically controverted.").

[5]In his Response, Martin admits this fact.  See Response at 2.  Martin maintains that he
allowed trainees to use the lathe without the shield when the "part was too big," but only if the
asked a supervisor first.  Response at 2.

[6]There is a genuine dispute whether Martin instructed Gravlin on using a lathe without a
guard before Gravlin was injured, or whether Martin created that training after Gravlin was injured.
APS argues that the lathe incident happened after Martin instructed Gravlin.  See MSJ Memo ¶ 10,
at 3 (citing Martin Depo. at 12:11-14:13).  Martin contends that he "developed the training after
the incident."  Response at 2 (citing Martin Depo. at 11:7-12:20).  In their Reply, APS alleges that
the record does not support Martin's contention, and that "all of the testimony on that issue
supports the position that Martin gave the improper instruction prior to the incident and that his
instruction was the cause of the accident."  Reply at 11.  APS does not support its allegation with
any record citation.

Gravlin's lathe incident immediately.  See MSJ Memo ¶ 11, at 3 (asserting this fact); Martin Depo. at 37:21-39:2; id. at 39:21-42:17; Response at 2 (admitting this fact).  During the investigation, Kevin Crosby, the production manager, and Kevin Keene, the maintenance manager interviewed Martin about the incident, and Martin told them that "he had instructed the trainees that lathes could be operated without a guard if they discussed it with their supervisor first."  MSJ Memo ¶ 11, at 3 (asserting this fact).  See Martin Depo. at 37:21-39:2; id. at 39:21-42:17; Response at 2 (admitting this fact).

After the investigation, APS fired Gravlin and his supervisor, Scott Brady.  See MSJ Memo ¶ 12, at 3 (asserting this fact); Martin Depo. at 36:16-37:6; Response at 2 (admitting this fact).  Several APS leaders involved in investigating the lathe incident, including Thomas Livingston, the Plant Manager, and Crosby, wanted Martin to be fired for his "erroneous instruction."  MSJ Memo ¶ 13, at 3 (asserting this fact).  See Martin Depo. at 11:3-12:10; id. at 37:21-39:2; id. at

---

The timing of the Gravlin's incident and Martin's training is not clear from the record.  In the Martin Depo., Martin states that, during the investigation following Gravlin's lathe incident, Kevin Keene, the maintenance manager, and Kevin Crosby, the production manager, went to Martin's office to ask Martin "some questions about the lathe incident and the training that I created for lathe and machine safety from a previous incident where an individual got caught up in the machine and almost died."  Martin Depo. at 13:3-7.  Martin then discusses a "lathe accident," after which the APS Safety Department "decided that all the lathes needed to have guards on them."  Martin Depo. at 13:11.  Martin then states that this incident "was like several . . . months after that, that the plant management was responsible for getting these guards on the machines."  Martin Depo. at 13:12-14.  According to Martin, however, there was another incident during the period when only some lathe machines had guards and when "an individual was using a lathe and the part that he had in the lathe was too big for the shield to go around it," so he "had it in the up position."  Martin Depo. at 13:18-20.  Martin goes on to allege that, during the investigation of this other incident when somebody had an unguarded lathe, there was a dispute whether Martin had approved that practice during his training.  See Martin Depo. at 13:24-14:13.  The timeline of these events is not clear from Martin's explanation, because Martin does not explain which incident happened first, when he created his lathe training, and who he trained.  Adopting all reasonable inferences in Martin's favor, the Court concludes that the lathe incident happened before Martin's lathe training.  There is, therefore, a genuine dispute about when Martin trained Gravlin on when and whether to use a lathe without a guard.

117:20-119:25; Response at 2 (admitting this fact).  Instead of firing Martin, APS placed Martin on a five-day leave and demoted him to the position of Instructor I.  See MSJ Memo ¶ 14, at 3 (asserting this fact); Martin Depo. at 11:3-12:10; id. at 37:21-39:2; id. at 117:20-119:25; Response at 2 (admitting this fact).

On May 19, 2015, Alejandro Ortiz, Martin's supervisor, gave Martin an Employee Action Document, which states that Martin had not followed APS' safety standards when he told employees that they could use lathes without guards, because it created "'the conduct of unsafe work practices by the machinist [Martin] trained.'"  MSJ Memo ¶ 15, at 3 (asserting this fact)(emphasis in original)(quoting Non-Union Employee Action Document at 68, filed March 15, 2021 (Doc. 23-1)("EAD")).  See Response at 2 (admitting this fact).  The EAD also noted that APS was suspending Martin for five days, demoting him to the Instructor I position, and requiring Martin to have another APS employee review all his trainings.  See MSJ Memo ¶ 16, at 3 (asserting this fact); EAD at 68; Response at 2 (admitting this fact).  In 2015, Martin's overall performance score was a "'2,' reflecting unsatisfactory performance."  MSJ Memo ¶ 17, at 4 (asserting this fact).  See 2015 Annual Evaluation for Thomas Martin at 83, filed March 15, 2021 (Doc. 23-1)("2015 Performance Rev."); Response at 2 (admitting this fact).

### 3.   Martin's Performance After the Lathe Incident.

Later in 2015, Christopher Susag became Martin's supervisor and Clay Goodman became Martin's manager.  See MSJ Memo ¶ 18, at 4 (asserting this fact).  See Declaration of Clay Goodman ¶¶ 2-3, at 86 (executed March 5, 2021), filed March 15, 2021 (Doc. 23-1)("Goodman Decl."); Response at 2 (admitting this fact).  In 2016, Martin received a "3" on his performance review, because his performance improved under Susag's supervision, so he was promoted back to Instructor II.  MSJ Memo ¶ 19, at 4 (asserting this fact).  See 2016 Annual Evaluation for

Thomas Martin at 90, filed March 15, 2021 (Doc. 23-1)("2016 Performance Rev."); Response at 2 (admitting this fact).  In 2017, however, Martin received more complaints about his performance. See MSJ Memo ¶ 20, at 4 (asserting this fact).   See Martin Depo. at 61:1-3; 2017 Annual Evaluation for Thomas Martin at 114, filed March 15, 2021 (Doc. 23-1)("2017 Performance Rev.").[7]  Specifically, two of Martin's coworkers, Norbert Beyet and Bobby Tanner, complained to Susag and Goodman that Martin was "confrontational, abrasive, and aggressive," and that Martin would attempt to "act as a manager and would tell them what to do," despite the fact that they were "both senior trainers."  MSJ Memo ¶ 20, at 4 (asserting this fact).  See Martin Depo. at 61:1-3; 2017 Performance Rev. at 114; Response at 2 (admitting this fact).  On October 30, 2017, Susag talked to Martin about the complaints, telling him that he was not "creating a positive or healthy work environment," and that he was "influencing out of fear and intimidation rather than cooperation and teamwork."   MSJ Memo ¶ 21, at 4 (asserting this fact).   See Coaching Documentation at 119, filed March 15, 2021 (Doc. 23-1); Email Between Susag and Martin at 123, filed March 25, 2021 (Doc. 23-1)("Susag Email"); Response at 3 (admitting this fact).  Susag also

---

[7]APS contends that Martin's 2017 performance was not satisfactory.  See MSJ Memo ¶ 20, at 4 (citing Martin Depo. at 61:1-3; 2017 Performance Rev. at 114).  In his Response, Martin admits that he received complaints, but disputes that his performance was not satisfactory.  See Response at 2 (citing Martin Depo. at 61:1-63:18).  APS does not address this point in its Reply.

Martin's 2017 Performance Rev. indicates that he does not meet APS' expectations regarding respect and inclusion, and that his interactions with his coworkers is "often perceived by them as confrontational, abrasive, and aggressive." 2017 Performance Rev. at 114.  Elsewhere, his 2017 Performance Rev. states that he "[a]ctively worked with [his] team . . . to ensure they have stayed on top of all their training needs," had no "personal work injuries," "stayed on top of all required training this year, with zero past due," and is "[c]ontinually reviewing procedures." 2017 Performance Rev. at 111.  Moreover, the 2017 Performance Rev. states that he is "adaptable" and "can change direction quickly with[ ]new information," and that communicating well is "very important to" him.  2017 Performance Rev. at 111.  Drawing all reasonable inferences in Martin's favor, the Court concludes that there is a genuine dispute whether Martin's performance dropped in 2017, or whether the complaints about his communication and interpersonal skills were unfounded or misdirected.

reminded Martin that he was assigned as "the point of contact for a Four Corners SCR project," but that he had not communicated consistently about the project.  MSJ Memo ¶ 22, at 4 (asserting this fact).  See Coaching Documentation at 119; Susag Email at 123; Response at 3 (admitting this fact).  Susag had the impression that Martin was "'very passive'" during their conversation and remembers Martin saying that he "'just cannot have a conversation with them!" and that "'[t]hey just ignore me!'"  MSJ Memo ¶ 23, at 5 (asserting this fact).  See Coaching Documentation at 119; Martin Depo. at 151:11-16; Response at 3 (admitting this fact).  Martin "repeatedly" told Susag that he believed that Tanner and Beyet were "trying to get him fired because he was white."  Memo ¶ 24, at 5 (asserting this fact).  See Martin Depo. at 96:14-98:6; id. at 101:10-102:13); Response at 3 (admitting this fact).  After Susag counseled Martin, Susag spoke with Martin's coworkers on December 18, 2017.  See MSJ Memo ¶ 25, at 5 (asserting this fact).  See Coaching Documentation at 119); Response at 3 (admitting this fact).

Martin received a "2" on his 2017 Performance Rev., because he had trouble meeting APS' "core values of respect and inclusion."  MSJ Memo ¶ 26, at 5 (asserting this fact); see 2017 Performance Rev. at 116); Response at 3 (admitting this fact), and because Martin's coworkers thought his communication was confrontational, abrasive, and aggressive, see MSJ Memo ¶ 27, at 5 (asserting this fact); 2017 Performance Rev. at 114; Response at 3 (admitting this fact).[8]  Martin struggled to understand that he was not a decisionmaker, so he did not have the authority to direct

---

[8]In his Response, Martin admits this fact, but contends that he was not aggressive or confrontational with his coworkers.  See Response at 3 (citing Martin Depo. at 61:1-63:18).  The Martin Depo. portions to which Martin cites do not support that Martin was aggressive and confrontational with his coworkers.  In the Martin Depo., Martin states that he would talk to his coworkers "just like I'm talking to you" and that he does not know how to "make this aggressive and threatening."  Martin Depo. at 61:4-9.  The Martin Depo. portion to which Martin cites suggests only that Martin's coworkers complained about his communication style; that little fact is all that the Court will deem undisputed.

his coworkers, and his communication about the Four Corners SCR project was inconsistent.  See MSJ Memo ¶ 27, at 5 (asserting this fact); 2017 Performance Rev. at 114; Response at 3 (admitting this fact).  Goodman wrote in Martin's 2017 Performance Rev. that Martin's communication with his coworkers at Four Corners was not consistent and sometimes "non-existent," because Martin's coworkers contended that Martin was sometimes "nearly confrontational."  MSJ Memo ¶ 28, at 5 (asserting this fact).  See 2017 Performance Rev. at 114).[9]  Goodman also noted in the 2017 Performance Rev. that Martin needed to improve his performance.  See MSJ Memo ¶ 28, at 5 (asserting this fact); 2017 Performance Rev. at 114; Response at 3 (admitting this fact).

Despite Susag and Goodman counseling Martin on his communication style and his behavior, Martin's behavior did not change in 2018.  See MSJ Memo ¶ 29, at 5 (asserting this fact); Martin Depo. at. 66:21-68:17; Response at 3 (admitting this fact).  For example, Martin interrupted a class that his coworker Bobby Tanner was teaching, see MSJ Memo ¶ 29, at 5 (asserting this fact); Martin Depo. at. 66:21-68:17,[10] even though Martin was not Tanner's

---

[9]In his Response, Martin admits this fact, but contends that he was not aggressive or confrontational with his coworkers.  See Response at 3 (citing Martin Depo. at 61:1-63:18).  The Martin Depo. portions to which Martin cites do not support that Martin was aggressive and confrontational with his coworkers.  In the Martin Depo., Martin states that he would talk to his coworkers "just like I'm talking to you" and that he does not know how to "make this aggressive and threatening."  Martin Depo. at 61:4-9.  The Martin Depo. portion to which Martin cites suggests only that Martin's coworkers complained about his communication style; that little fact is all that the Court will deem undisputed.

[10]In his Response, Martin contends that he did not interrupt a training class.  See Response at 3 (citing Martin Depo. at 63:1-18).  In the Martin Depo., Martin states that he "stepped into [Tanner's] classroom and asked him if I could speak to him.  And he said yes."  Martin Depo. at 62:14-15.  Martin then notes that he asked Tanner about the training he was doing and that Tanner told him that "they were doing some stuff that was outside of what we had done in the past.  So I was asking him to hold off on that training until we could get an answer from Christopher."  Martin Depo. at 62:18-20.  Because Martin admits that he stepped into Tanner's classroom while Tanner was teaching, asked to speak with Tanner, and then requested that Tanner stop the class, the Court concludes that Martin interrupted the class.

supervisor and did not have the authority to tell Tanner to stop teaching, see MSJ Memo ¶ 30, at 5 (asserting this fact); Martin Depo. at. 69:8-10).[11]   A group of trainees "was asking about things trainees in other groups were learning, so he asked Tanner to hold off on teaching until they could discuss the issue with Susag."  MSJ Memo ¶ 29, at 5-6 (asserting this fact).  See Martin Depo. at. 66:21-68:17).[12]   Tanner was "very upset" that Martin had interrupted his class, so he complained to Goodman about Martin, because he thought Martin had acted inappropriately.  MSJ Memo ¶ 31, at 6 (asserting this fact).   See Email from Beyet to Goodman at 126, dated May 23, 2018, filed March 15, 2021 (Doc. 23-1)("Goodman Email")).[13]   Martin acknowledges that Tanner could have seen his actions as an interruption.   See MSJ Memo ¶ 32, at 6 (asserting this fact); Martin Depo. at. 70:20-25 (asserting this fact).[14]   Soon after Martin interrupted Tanner's class, Goodman called Martin to tell in that his actions were unacceptable, and to instruct him to "stop attempting to exert any managerial authority over his coworkers."   MSJ Memo ¶ 33, at 6 (asserting this fact).   See

---

[11]In his Response, Martin does not respond to this fact other than to reiterate his contention that he did not interrupt a training class.  See Response at 3 (citing Martin Depo. at 63:1-18).  The Court, therefore, deems this fact undisputed.  See D.N.M. LR-Civ 56.1(b)("All material facts set forth in the response will be deemed undisputed unless specifically controverted.").

[12]In his Response, Martin does not respond to this fact other than to reiterate his contention that he did not interrupt a training class.  See Response at 3 (citing Martin Depo. at 63:1-18).  The Court, therefore, deems this fact undisputed.  See D.N.M. LR-Civ 56.1(b)("All material facts set forth in the response will be deemed undisputed unless specifically controverted.").

[13]In his Response, Martin does not respond to this fact other than to reiterate his contention that he did not interrupt a training class.  See Response at 3 (citing Martin Depo. at 63:1-18).  The Court, therefore, deems this fact undisputed.  See D.N.M. LR-Civ 56.1(b)("All material facts set forth in the response will be deemed undisputed unless specifically controverted.").

[14]In his Response, Martin argues that he "did not speculate to what other employees were thinking".  Response at 3 (citing Martin Depo. at 70:1-25).  In the Martin Depo., in response to the question, "So from his viewpoint, he could have seen it as an interruption and demand to his class; correct?" Martin states, "I guess so."  Martin Depo. at 70:23-15.  The Court concludes, therefore, that Martin acknowledges that Tanner could have interpreted Martin's actions as an interruption.

Goodman Decl. ¶ 7, at 86; May, 2018 Coaching Documentation at 128, filed March 15, 2021 (Doc. 23-1); Response at 3 (admitting this fact).

Communication problems between Martin and his coworkers persisted, so Susag again "coached" Martin on June 27, 2018.  MSJ Memo ¶ 34, at 6 (asserting this fact).  See June, 2018 Coaching Documentation at 130, filed March 15, 2021 (Doc. 23-1).[15]  In the June, 2018, Coaching Documentation, Susag stated that "'[w]e need to work with and treat our fellow team members professionally and with respect at all times,'" and

> [n]one of the instructors have authority over any other instructors.  If you feel that another team mate is not going in the right direction or doing what they should, your role is to address it as a peer concerned for their success as a team.  If further action is needed, please contact me immediately.

MSJ Memo ¶ 35, at 6 (asserting this fact).  See June, 2018 Coaching Documentation at 130; Response at 4 (admitting this fact).

### 4.   Martin's Safety Concerns.

In June, 2017, Martin raised a safety concern, alleging that a new training room was next to an old control room that had been converted into a breaker room.  See MSJ Memo ¶ 57, at 10 (asserting this fact); Martin Depo. at 121:14-122:15; id. at 129:10-132:5); Response at 5 (admitting this fact).  Martin believed that the breaker room was unsafe, because there was a "high arc potential,"[16] MSJ Memo ¶ 58, at 10 (asserting this fact); see Martin Depo. at 121:14-122:15; id. at

---

[15]In his Response, Martin disputes that the communications problems with his coworkers persisted and that Susag coached him, because "his coworkers were not trying to communicate with him."  Response at 4 (citing Martin Depo. at 71:1-72:17).  In the Martin Depo., Martin states that he was "trying to improve the communication at that point, but that was not reciprocated."  Martin Depo. at 72:16-17.  Adopting all reasonable inferences in Martin's favor, the Court concludes that the communication problems between Martin and his coworkers persisted, and that Susag coached him on June 27, 2018, because Martin neither disputes that the communication problems persisted, nor that Susag coached him on June 27, 2018,

[16]An electric arc is an "electrical breakdown of a gas that produces a prolonged electrical

129:10-132:5); Response at 5 (admitting this fact), and that APS should block off the room, see MSJ Memo ¶ 58, at 10 (asserting this fact); Martin Depo. at 134:5-136:2; Response at 5 (admitting this fact). Martin discussed the issue with Bruce Salisbury, the plant manager, and then physically blocked the doors to the breaker room. See MSJ Memo ¶ 59, at 10 (asserting this fact); Martin Depo. at 134:5-136:2; Response at 5 (admitting this fact). Tanner and Beyet, however, had earlier moved a refrigerator, a table, and some supplies into the breaker room so they could use it as a break room. See MSJ Memo ¶ 58, at 10 (asserting this fact); Martin Depo. at 121:14-122:15; id. at 129:10-132:5; Response at 5 (admitting this fact). Tanner and Beyet objected to Martin blocking off the breaker room, because they believed that room needed two exits for safety reasons. See MSJ Memo ¶ 60, at 10 (asserting this fact); Martin Depo. at 136:15-22; Response at 6 (admitting this fact). Martin, therefore, asked Salisbury to email Susag about the issue. See MSJ Memo ¶ 61, at 10 (asserting this fact); Martin Depo. at 134:5-136:2; id. 136:24-137:18; Response at 6 (admitting this fact). Susag agreed, and required that the refrigerator and supplies be removed from the breaker room, and that the instructors no longer use the room. See MSJ Memo ¶ 61, at 10-11 (asserting this fact); Martin Depo. at 134:5-136:2; id. 136:24-137:18; Response at 6 (admitting this fact). Martin agreed with how Susag handled the issue. See MSJ Memo ¶ 62, at 11 (asserting this fact); Martin Depo. at 136:24-137:18; id. at 138:7-139:11; Response at 6 (admitting this fact). After Susag resolved the issue, neither Susag nor Goodman said anything to Martin about the incident. See MSJ Memo ¶ 62, at 11 (asserting this fact); Martin Depo. at 136:24-137:18; id. at 138:7-139:11.[17]

---

discharge. The current through a normally nonconductive medium such as air produces a plasma; the plasma may produce visible light." Electric Arc, Wikipedia, https://en.wikipedia.org/wiki/Electric_arc (last visited January 5, 2022).

[17]In his Response, Martin purportedly disputes this fact, contending that "the effort to make

On another occasion, Martin expressed concern to Susag about high school students visiting Four Corners and walking around the plant unchaperoned.  See MSJ Memo ¶ 63, at 11 (asserting this fact); Martin Depo. at 139:17-140:7; id. at 140:24-141:12; Response at 6 (admitting this fact).  Each time Martin raised this concern with Susag, Susag promised to contact the school to resolve the issue, but did not say anything negative about the concern to Martin.  See MSJ Memo ¶ 63, at 11 (asserting this fact); Martin Depo. at 139:17-140:7; id. at 140:24-141:12; Response at 6 (admitting this fact).  Susag believed that he resolved the issue with a telephone call, and thought it was good that Martin brought the issue to his attention.  See MSJ Memo ¶ 64, at 11 (asserting this fact); Videoconference Deposition via Zoom of Christopher Gary Susag at 8:17-9:5 (taken February 2, 2021), filed March 15, 2021 (Doc 23-1)("Susag Depo.")); Response at 6 (admitting this fact).  Despite Susag's efforts, however, Martin's co-workers still allowed the students to wander the plant unchaperoned.  See Response at 6 (asserting this fact); Martin Depo. at 139:17-25; id. 140:19.[18]

---

life difficult for me really escalated" after the breaker room incident.  Response at 6 (citing Martin Depo. at 137:10-25).  In the Martin Depo., Martin states that neither Susag nor Goodman said anything to him after the breaker room incident.  See Martin Depo. at 137:20-22.  It is, therefore, undisputed that, after the breaker room incident, neither Susag nor Goodman said anything to Martin about it.

In the Reply, APS does not respond to Martin's contention that the efforts to make Martin's life "difficult" escalated after the breaker room incident.  Response at 6 (citing Martin Depo. at 137:10-25).  Martin does not immediately elaborate in the Martin Depo., nor does he cite to any other evidence in the record that supports his assertion.  The Court concludes, therefore, that, to the extent that Susag or Goodman retaliated, the retaliation did not escalate after the breaker room incident.  See Fed. R. Civ. P. 56(c)(1)(A) ("A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . . ."); Halley v. Huckaby, 902 F.3d 1136, 1143 (10th Cir. 2018)(stating that summary judgment may be warranted if the movant notes a lack of evidence for an essential element of the claim).

[18]In the Reply, APS does not respond to this fact.  The Court, therefore, deems this fact

In July, 2017, APS moved some equipment into a storage space and re-keyed the building where the storage space is located.  See MSJ Memo ¶ 65, at 11 (asserting this fact); Martin Depo. at 141:18-143:21; id. at 145:2-18; Response at 6 (admitting this fact).  At first, Martin was the only trainer with keys to the building, even though other trainers also needed access to the building to retrieve supplies.  See MSJ Memo ¶ 65, at 11 (asserting this fact); Martin Depo. at 141:18-143:21; id. at 145:2-18; Response at 6 (admitting this fact).  Once the other trainers received keys to the building, Martin noticed that the building was left open "on a few occasions."  MSJ Memo ¶ 66, at 11 (asserting this fact).  See Martin Depo. at 146:21-149:13; Response at 6 (admitting this fact).  Martin reported that the building had been left open.  See MSJ Memo ¶ 67, at 11 (asserting this fact); Martin Depo. at 154:2-155:11; Response at 6 (admitting this fact).  Susag then "addressed the issue with Tanner and Beyet and confirmed the area would remain secure."  MSJ Memo ¶ 67, at 11 (asserting this fact).  See Martin Depo. at 154:2-155:11; Response at 6 (admitting this fact).  After Susag spoke with Tanner and Beyet, Martin "got into a dispute with Beyet and Tanner," which "resulted in his coaching in October 2017."  MSJ Memo ¶ 68, at 12 (asserting this fact).  See Martin Depo. at 149:15-150:11; Response at 6 (admitting this fact).

In October, 2017, at the fire chief's direction, Martin closed off a welding booth area by marking it with red tape, because the welding booth did not have proper ventilation.  See MSJ Memo ¶ 69, at 12 (asserting this fact); Martin Depo. at 156:13-160:16; Response at 6 (admitting this fact).  Several welders complained to Susag about how Martin handled the situation.  See MSJ Memo ¶ 71, at 12 (asserting this fact); Susag Depo. at 21:22-24:11; Response at 6 (admitting this fact).  Susag asked Martin to remove the red tape, and "they ensured the booths had proper

undisputed.  See D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the response will be deemed undisputed unless specifically controverted.")

ventilation."  MSJ Memo ¶ 71, at 12 (asserting this fact).  See Susag Depo. at 21:22-24:11;

Response at 6 (admitting this fact).  The fire chief later resolved the issue.  See MSJ Memo ¶ 70,

at 12 (asserting this fact); Martin Depo. at 156:13-160:16; Response at 6 (admitting this fact).

### 5. Martin Complains to Human Resources About Goodman.

On June 1, 2018, Martin met with Michelle Clines, the Human Resources Business Partner,

about Goodman.  See MSJ Memo ¶ 73, at 12 (asserting this fact); Martin Depo. at 98:12-101:8;

id. at 166:20-170:18; Excerpt from Martin Timeline at 155, filed March 15, 2021 (Doc. 23-

1)("Martin Timeline"); Response at 6 (admitting this fact).  In that meeting, Martin complained of

age discrimination.  See Response at 6 (asserting this fact); Martin Depo. at 168:3-12.[19]  On or

around August 8, 2018, Martin again met with Clines.  See MSJ Memo ¶ 77, at 13 (asserting this

fact); Martin Depo. at 167:19-168:20; id. at 178:9-179:3; EthicsPoint Incident Management Report

at 159 (dated closed September 20, 2018), filed March 15, 2021 (Doc. 23-1)("EthicsPoint

---

[19]APS asserts that Martin did not complain about age discrimination at the meeting.  See MSJ Memo ¶¶ 74-75, at 12-13 (asserting this fact).  Martin disputes this assertion.  See Response at 6.  In its Reply, APS does not respond other than to note again that "Martin claims he made a complaint of age discrimination of Michele Clines on June 1, 2018."  Reply at 6-7.

In the Martin Depo., Martin states that, when Clines visited his office on June 1, 2018, he told Clines that Clay was being aggressive towards him and that "I felt my age was a factor."  Martin Depo. at 100:16.  Martin also states that he "first discuss[ed] age discrimination with Human Resources" the "first meeting" he had with Clines.  Martin Depo. at 168:5-7.  Making all reasonable inferences in Martin's favor, therefore, the Court concludes that Martin first complained of age discrimination to Clines on June 1, 2018.

Clines does not, however, recall Martin mentioning age discrimination.  See MSJ Memo ¶ 76, at 13 (asserting this fact); Declaration of Michele Clines at 155, executed March 14, 2021, filed March 15, 2021 (Doc. 23-1)("Clines Decl.").  Martin states that he disputes this asserted fact, because he discussed age discrimination with Clines.  See Response at 7 (citing Martin Depo. at 168:2-12).  In the Martin Depo., Martin does not discuss whether Clines remembers Martin discussing age discrimination.  For the purpose of this MSJ, the Court concludes, therefore, that Clines does not remember Martin complaining of age discrimination, but Clines' lack of memory on the subject does not dispute with competent evidence that Martin did not mention age discrimination, and the Court will deem the fact that Martin complained of age discrimination at the July 1, 2018, meeting to be undisputed.

Report"); Response at 7 (admitting this fact).  In that meeting, Martin told Clines that Goodman

scheduled a team retreat at the same time when Martin was scheduled to give a speech in Tucson,

Arizona, and that Martin believed that, by scheduling the retreat at the same time, Goodman was

retaliating against him for speaking with Clines on June 1, 2018.  See MSJ Memo ¶ 77, at 13

(asserting this fact); Martin Depo. at 167:19-168:20; id. at 178:9-179:3; EthicsPoint Report at 159;

Response at 7 (admitting this fact).  Clines spoke with Goodman and informed him that Martin

was concerned about the retreat's scheduling.  See MSJ Memo ¶ 78, at 13 (asserting this fact);

Goodman Decl. at 86; Clines Decl. at 4-7.[20]  Goodman told Clines that he had scheduled the retreat

"based on dates that would allow the most members of the team to attend," that he "did not

purposely schedule the retreat to conflict with Martin's speech," and that "Martin's speech was

not work-related and work-related functions took precedence."  MSJ Memo ¶ 79, at 13 (asserting

this fact).  See Goodman Decl. at 87; Clines Decl. at 4-7; EthicsPoint Report at 159.[21]  Clines then

concluded that "there was no retaliation," and told Martin what she had concluded.  MSJ Memo

¶ 80, at 13 (asserting this fact).  See Clines Decl. at 150; Ethics Point Report at 158.[22]

---

[20]Martin disputes this asserted fact, contending that "[a]fter he spoke to HR Plaintiff was
retaliated against."  Response at 7 (citing Martin Depo. at 169:5-25; id. at 170:1-11).  The Martin
Depo. portions to which Martin cites do not address what Clines told Goodman, but instead address
whether Martin believes APS retaliated against him by scheduling a company retreat when he was
scheduled to give a speech that was not strictly work-related.  The Court, therefore, deems this fact
undisputed.  See D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the response will be
deemed undisputed unless specifically controverted.").

[21]Martin disputes this asserted fact, contending that "[a]fter he spoke to HR Plaintiff was
retaliated against."  Response at 7 (citing Martin Depo. at 169:5-25; id. at 170:1-11).  The Martin
Depo. portions to which Martin cites do not address what Clines told Goodman, but instead address
whether Martin believes APS retaliated against him by scheduling a company retreat when he was
scheduled to give a speech that was not strictly work-related.  The Court, therefore, deems this fact
undisputed.  See D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the response will be
deemed undisputed unless specifically controverted.").

[22]Martin disputes this asserted fact, contending that "[a]fter he spoke to HR Plaintiff was

6.     **Martin's Termination.**

APS requires trainees to "complete tasks under the supervision of experienced evaluators and supervisors."  MSJ Memo ¶ 36, at 7 (asserting this fact).  See Martin Depo. at 76:9-77:8; Qualification Card Administration Procedure at 132-35, filed March 15, 2021 (Doc. 23-1)("Qual. Card Admin. Proc."); Qualification Card Validation Checklist at 137-38, filed March 15, 2021 (Doc. 23-1)("Qual. Card Checklist"); Response at 4 (admitting this fact).  A system known as "Qual. Cards" is used to track task completion.  MSJ Memo ¶ 36, at 7 (asserting this fact).  See Martin Depo. at 76:9-77:8; Qual. Card Admin. Proc. at 132-35; Qual. Card Checklist at 137-38; Response at 4 (admitting this fact).  Qual Cards "can only be signed off on by a journeyman, supervisor, or instructor."  MSJ Memo ¶ 36, at 7 (asserting this fact).  See Martin Depo. at 76:9-77:8; Qual. Card Admin. Proc. at 132-35; Qual. Card Checklist at 137-38; Response at 4 (admitting this fact).

Sometime in or around September, 2018, APS discovered that trainee Calvin Johnson had falsified training records "by filling in supervisor names on his own Qual Cards."  MSJ Memo ¶ 37, at 7 (asserting this fact).  See Micatrotto Decl. ¶ 5, at 4; Response at 4 (admitting this fact).  Johnson indicated that Martin had told trainees that they could "enter the names of their evaluators or supervisors on their Qual Cards instead of having the evaluators enter their own names/initials themselves."  MSJ Memo ¶ 38, at 7 (asserting this fact).  See Micatrotto Decl. ¶ 5, at 4.[23]  Because

---

retaliated against."  Response at 7 (citing Martin Depo. at 169:5-25; id. at 170:1-11).  The Martin Depo. portions to which Martin cites do not address what Clines told Goodman, but instead address whether Martin believes APS retaliated against him by scheduling a company retreat when he was scheduled to give a speech that was not strictly work-related.  The Court, therefore, deems this fact undisputed.  See D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the response will be deemed undisputed unless specifically controverted.").

[23]Martin purportedly disputes this alleged fact, but does not explain why, and cites to several Martin Depo. portions.  See Response at 4 (citing Martin Depo. at 77:23-78:6).  In the cited

of Johnson's explanation, Clines and Micatrotto began an investigation.  See MSJ Memo ¶ 38, at 7 (asserting this fact); Micatrotto Decl. ¶ 6, at 4; Response at 4 (admitting this fact).  Clines and Micatrotto first spoke with Susag about the directions that he had given to the APS trainers.  See MSJ Memo ¶ 38, at 7 (asserting this fact); Micatrotto Decl. ¶ 6, at 4; Response at 4 (admitting this fact).  Susag responded that it was "never acceptable for a trainee to write in the names/initials of evaluators on their own Qual Cards."  MSJ Memo ¶ 38, at 7 (asserting this fact).  See Micatrotto Decl. ¶ 6, at 4; Response at 4 (admitting this fact).  Susag also told Clines and Micatrotto that he had instructed the trainees that, if the trainees had any difficulty securing a signature from an evaluator, the trainee "should inform their supervisor or go to another supervisor for that task."  MSJ Memo ¶ 40, at 7 (asserting this fact).  See Micatrotto Decl. ¶ 7, at 4; Response at 4 (admitting this fact).

Clines and Micatrotto also interviewed the three other instructors: Beyet, Isabelle Billey, and Tanner.  See MSJ Memo ¶ 41, at 7 (asserting this fact); Micatrotto Decl. ¶ 58, at 5; Response at 4 (admitting this fact).  Beyete, Billey, and Tanner all corroborated Susag's information about Qual Card instructions.  See MSJ Memo ¶ 41, at 7 (asserting this fact); Micatrotto Decl. ¶ 9, at 5; Response at 4 (admitting this fact).  Beyete, Billey, and Tanner told Clines and Micatrotto that "trainees who had issues getting evaluators to sign off on their Qual Cards could consult with their supervisors or go to another evaluator."  MSJ Memo ¶ 41, at 8 (asserting this fact).  See Micatrotto

---

Martin Depo. portion, Martin states that he told Johnson and "several other employees" that they would have "trouble with some of the employees on the unit not willing to sign it off even though they did the work with them," so he instructed Johnson and several other employees that they could "record" who trained them, "and then when you sit with the supervisor to sign off the Qual Card, tell the supervisor who you did that task [with], because then the supervisor can sign off that task, because the supervisor is ultimately responsible for signing off the Qual Card."  Martin Depo. at 79:14-23.  Martin does not anywhere dispute what Johnson indicated.  The Court, therefore, deems this fact undisputed.  See D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the response will be deemed undisputed unless specifically controverted.").

Decl. ¶ 8, at 5; Response at 4 (admitting this fact).  Beyete, Billey, and Tanner also stated that it was "never acceptable for a trainee to enter an evaluator's name/initials as validation of successful task completion on a Qual Card."  MSJ Memo ¶ 42, at 8 (asserting this fact).  See Micatrotto Decl. ¶ 9, at 5; Response at 4 (admitting this fact).  Clines and Micatrotto then interviewed Martin, who told them that he had instructed the trainees to "record" the evaluator's name on the Qual Card if that evaluator refused to enter his or her name or initials after a required training.  MSJ Memo ¶ 43, at 8 (asserting this fact).  See Micatrotto Decl. ¶ 10, at 5; Martin Depo. at 79:12-82:4; id. at 73:13-84:9; id. at 85:15-86:17; Response at 4 (admitting this fact).  Martin told Clines and Micatrotto that he "specifically instructed trainees to record the name of the evaluator" and not to "'sign off' on the task."  MSJ Memo ¶ 44, at 8 (quoting Martin Depo. at 79:21) (asserting this fact).  See Micatrotto Decl. ¶ 11, at 5; Martin Depo. at 79:12-82:4; id. at 73:13-84:9; id. at 85:15-86:17; Response at 4 (admitting this fact).  Martin also stated that he told the trainees that they need to review the Qual Cards with their leaders and inform the leaders if the evaluator refuses to sign off.  See MSJ Memo ¶ 44, at 8 (asserting this fact); Micatrotto Decl. ¶ 10, at 5; Martin Depo. at 79:12-82:4; id. at 73:13-84:9; id. at 85:15-86:17; Response at 4 (admitting this fact).  Martin never told the trainees that they should not record their evaluators' names on their Qual Cards, because it would cause confusion if trainees began to record evaluator names on the Qual Cards. See MSJ Memo ¶ 45, at 8 (asserting this fact); Martin Depo. at 88:15-89:20; id. at 93:18-94:10; Response at 4 (admitting this fact).

After finishing their investigation, Clines and Micatrotto concluded that Martin had violated APS policy by instructing trainees that they could record their evaluators' names on the Qual Cards rather than having the evaluators themselves sign off on the Qual Cards.  See MSJ

Memo ¶ 46, at 8 (asserting this fact); Micatrotto Decl. ¶ 12, at 5.[24]  Martin's leaders then "held a

peer review" to examine the investigations' results and to determine what next should happen.  See

MSJ Memo ¶ 47, at 8 (asserting this fact); Micatrotto Decl. ¶ 17, at 6; Response at 4 (admitting

this fact).  Micatrotto, Goodman, Susag, Rick Nicosia, manager of the Cholla Power Plant,[25] Andre

Bodrog, manager of the West Phoenix Power Plant,[26] Clines, and Laura Showalter, a senior

attorney, were at the meeting.  See MSJ Memo ¶ 48, at 9 (asserting this fact); Susag Depo. at

17:15-25; Response at 4 (admitting this fact).  The meeting began with Micatrotto and Clines

reporting their investigations' findings, and with Micatrotto recommending that APS terminate

Martin's employment.  See MSJ Memo ¶ 49, at 9 (asserting this fact); Susag Depo. at 19:21-20:9;

Response at 4 (admitting this fact).  After listening to the investigation's results and to Micatrotto's

recommendation, the meeting's participants voted unanimously to terminate Martin.  See MSJ

Memo ¶ 50, at 9 (asserting this fact); Susag Depo. at 15:2-24; Response at 4 (admitting this fact).

Martin's age, any safety concerns that he raised, or any of Martin's complaints about retaliation

---

[24]Martin purports to dispute this fact, but does not explain why he takes this position.  See
Response at 4 (citing Martin Depo. at 77:23-78:6).  Instead, Martin cites to several portions of the
Martin Depo. where Martin states that he did not instruct trainees to sign off on their Qual Cards
if they could not find someone to sign off for them.  See Martin Depo. at 77:23-78:6.  Because
Martin disputes Clines and Micatrotto's conclusion, and not that they reached a conclusion, the
Court deems this fact, that Clines and Micatrotto concluded that Martin violated APS policy by
instructing trainees that they could record their evaluators' names on the Qual Cards, to be
undisputed.  See D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the response will be
deemed undisputed unless specifically controverted.").

[25]The Cholla Power Plan is a 1.02-gigawatt coal power plant near Joseph City, Arizona.
See Cholla Power Plant, Wikipedia, https://en.wikipedia.org/wiki/Cholla_Power_Plant (last
visited January 14, 2022).

[26]The West Phoenix Power Plant is a 920-megawatt power plant in Maricopa County,
Arizona.  See List of Power Stations in Arizona, Wikipedia,
https://en.wikipedia.org/wiki/List_of_power_stations_in_Arizona (last visited January 14, 2022).

were not discussed at the meeting; the decision to fire Martin did not involve considerations of Martin' age, any safety concerns he raised, or any complaints he had made of age discrimination or retaliation. See MSJ Memo ¶ 51, at 9 (asserting this fact); Micatrotto Decl. ¶ 23, at 6.[27]

After the meeting, Susag called Martin and told him that, because of the findings of the investigation into the Qual Card incident where he was "improperly exercising managerial authority over his coworkers," and because of the lathe incident, he was terminated. See MSJ Memo ¶ 52, at 9 (asserting this fact); Martin Depo. at 95:4-25.[28]  On September 20, 2018, APS terminated Martin for violating a clearly established company policy. See MSJ Memo ¶ 53, at 9 (asserting this fact); Goodman Decl. ¶ 13, at 87; Non-Union Employee Action Document at 152

---

[27]Martin purports to dispute this alleged fact, contending only that he "made numerous reports of safety violations being committed by his coworkers." Response at 5.  The Court, therefore, deems undisputed that the decision to fire Martin did not involve any consideration of Martin's age, or any complaints of retaliation or of age discrimination that he had made. See D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the response will be deemed undisputed unless specifically controverted.").  In the portion of the Martin Depo. to which Martin cites, Martin contends that he had made complaints about safety, specifically regarding the break room and the unchaperoned high school students. See Martin Depo. at 121:1-123:5. Martin supplies no evidence that his two safety complaints are related to his termination.  Adopting all reasonable inferences in Martin's favor, the Court concludes, therefore, that the decision to fire Martin did not involve considerations of Martin' age, any safety concerns he raised, or any complaints that he had made of age discrimination or of retaliation.

[28]Martin purports to dispute this alleged fact, contending only that he never told trainees to violate company policy. See Response at 5 (citing Martin Depo. at 61:1-78:25).  In the portion of the Martin Depo. to which Martin cites, Martin does not discuss why he was fired. See Martin Depo at 611-78:25.  In the relevant portion of the Martin Depo., Martin states that he did not "inform trainees they could sign off on their own card if they couldn't find anyone to sign off on them." Martin Depo. at 78:3-5.  Elsewhere in the Martin Depo., Martin states that he instructed trainees that "if they couldn't get someone to sign off on [their Qual Card] they should record who they had done it with and take it to the supervisor." Martin Depo. at 81:2-5.  Martin does not dispute why he was fired, but only that the investigation's results are erroneous. See Martin Depo. at 78:1-81:25).  Adopting all reasonable inferences in Martin's favor, therefore, the Court concludes that APS fired Martin for violating a clearly established company policy. See D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the response will be deemed undisputed unless specifically controverted.").

(dated September 20, 2018), filed March 15, 2021 (Doc. 23-1)("2018 EAD").[29]   At the time, Martin was "in his late 50s."  Response at 9 (asserting this fact).[30]  Martin "just 'felt like' he was terminated because of his age."  MSJ Memo ¶ 81, at 13 (asserting this fact)(quoting Martin Depo. at 106:6-19).[31]

Martin believes there was a conspiracy among APS' leadership to terminate him, which he describes as a "witch hunt."  MSJ Memo ¶ 54, at 9 (asserting this fact).  See Martin Depo. at 117:20-119:25.[32]  According to Martin the conspiracy began with the 2015 lathe incident and, since then, APS' leadership was "looking for any reason to terminate him."  MSJ Memo ¶ 54, at 10 (asserting this fact).  See Martin Depo. at 117:20-119:25.[33]  Moreover, multiple APS employees

_____

[29]Martin purports to dispute this alleged fact, contending only that he never told trainees to violate company policy.  See Response at 5.  Because Martin does not dispute what Susag told him, the Court deems this fact undisputed.  See D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the response will be deemed undisputed unless specifically controverted.").

[30]In the Reply, APS does not respond to this asserted fact.  See Reply at 2.  The Court, therefore, deems this fact undisputed.  See D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the response will be deemed undisputed unless specifically controverted.").

[31]Martin does not state that he disputes this asserted fact.  See Response at 7.  Instead, Martin states that he was "only 18 months from retiring with full benefits" and that he "believe[s] age was a factor in his termination."  Response at 7.  The Court, therefore, deems undisputed the fact that Martin felt like he was terminated because of his age.  See D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the response will be deemed undisputed unless specifically controverted.").

[32]Martin purports to dispute this alleged fact, contending that he "made numerous reports of safety violations being committed by his co-workers."  Response at 5.  Because Martin does not dispute that he believes there was a conspiracy among APS' leadership, the Court deems this fact undisputed.  See D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the response will be deemed undisputed unless specifically controverted.").

[33]Martin purports to dispute this alleged fact, contending that he "made numerous reports of safety violations being committed by his co-workers."  Response at 5.  Because Martin does not dispute that he believes there was a conspiracy among APS' leadership, the Court deems this fact undisputed.  See D.N.M. LR-Civ 56.1(b) ("All material facts set forth in the response will be deemed undisputed unless specifically controverted.").

"complained about Martin's performance, including the Plant manager, the Production Manager, Martin's manager and supervisor, and Martin's coworkers."  MSJ Memo ¶ 55, at 10 (asserting this fact).  See Martin Depo. at 121:2-12.[34]  In October, 2016, before Martin had made any safety-related complaints or other complaints to Human Resources, Goodman told Martin that he would use the lathe incident to fire Martin.  MSJ Memo ¶ 56, at 10 (asserting this fact).  See Martin Depo. at 163:6-11.[35]

As far as Martin knows, Goodman has fired only one other older employee, Joe Kendall, and replaced him with Shawn Molden, "who was around the same age as Martin."  MSJ Memo ¶ 82, at 13-14 (asserting this fact).  See Martin Depo. at 114:8-115:19; Response at 7 (admitting this fact).  After APS terminated Martin, Melvin Yazzie filled his position.  See MSJ Memo ¶ 83, at 14 (asserting this fact); Susag Depo. at 19:8-17; Goodman Decl. ¶ 14, at 87; Response at 7 (admitting this fact).  At the time, Yazzie was fifty-eight years old and had worked for APS for approximately forty years.  See MSJ Memo ¶ 83, at 14 (asserting this fact); Susag Depo. at 19:8-

---

[34]Martin purports to dispute this alleged fact, contending that these people complained about him "because he was pointing out safety issues and unsafe working conditions."  Response at 5.  In the portion of the Martin Depo. to which Martin cites, Martin offers no evidence that the complaints were about him pointing out safety issues.  See Martin Depo. at 121:1-123:5.  In the Martin Depo., when asked if this coworkers complained about his performance, he states, "Yes, or complained about something," and then asserts that retaliation began after his complaints.  Martin Depo. at 121:9.  Martin's contention that the complaints were not about his performance is a statement of belief, but, "at the summary judgment stage, 'statements of mere belief' in an affidavit must be disregarded."  Argo v. Blue Cross and Blue Shield of Kansas, Inc., 452 F.3d 1193, 1200 (10th Cir. 2006)(quoting Tavery v. United States, 32 F.3d 1423, 1427, n.4 (10th Cir. 1994)).  Because Martin offers no reason to dispute this alleged fact other than his mere belief, the Court deems this fact undisputed.

[35]Martin purports to dispute this alleged fact, contending that he "made numerous complaints about safety issues at the Power Plant up until he was terminated," including "complaints about welding cubicles violating OSHA regulations and put up red barrier tape until it was fixed."  Response at 5.  In the portions of the Martin Depo. to which Martin cites, he states that he made these complaints "sometimes in 2017."  Martin Depo. at 156:23.

17; Goodman Decl. ¶ 14, at 87; Response at 7 (admitting this fact).  Tanner, Billey, and Beyet, Martin's coworkers, were "all the same age as or older than Martin; and the person who took Martin's place was older than Martin."  MSJ Memo ¶ 84, at 14 (asserting this fact).  See Goodman Decl. ¶ 15, at 87; Response at 7 (admitting this fact).  Moreover, both Goodman and Susag are "close in age to Martin."  MSJ Memo ¶ 85, at 14 (asserting this fact).  See Martin Depo. at 101:1-2; Goodman Decl. at 87; Response at 7 (admitting this fact).  Since APS fired Martin, he has looked online for other jobs in his area that are comparable to his APS job, but he has not applied to any job.  See MSJ Memo ¶ 85, at 14 (asserting this fact); Martin Depo. at 173:20-174:7.[36]

## PROCEDURAL BACKGROUND

On June 26, 2020, Martin sued APS in State court for: (i) age discrimination, in violation of the New Mexico Human Rights Act, N.M.S.A. § 238-1-7 ("NMHRA"); (ii) retaliation, in violation of the NMHRA; and (iii) retaliatory discharge, "in violation of New Mexico Public Policy."  Complaint for Employment Discrimination on the Basis of Age and Retaliation at 3, filed July 23, 2020 (Doc. 1-2)("Complaint").   Martin notes that he "filed a timely charge of discrimination with the New Mexico Human Rights Commission and received a Notice of Right to Sue."  Complaint ¶ 5, at 2.  APS removed the case to the United States District Court for the District of New Mexico on July 23, 2020.  See Notice of Removal, filed July 23, 2020 (Doc. 1)("Removal Notice").   In the Removal Notice, APS asserts that the Court has diversity jurisdiction, pursuant to 18 U.S.C. § 1332, because Martin is a citizen of New Mexico, APS is incorporated in and has its principal place of business in Arizona, and Martin seeks more than

---

[36]Martin disputes that he has not applied for any jobs since APS fired him, alleging instead that he "has not found one comparable to his job at APS in his home area."  Response at 8.  Martin then cites to Martin Depo. portions, in which, in response to being asked if he has applied for a job since APS fired him, Martin states "I have not."  Martin Depo. at 174:5.  The Court, therefore, deems undisputed that Martin has not applied to any jobs since APS fired him.

$75,000.00 in damages.  See Removal Notice at 1-2.

### 1.      The Summary Judgment Motion.

APS moves for summary judgment.  See MSJ at 1; MSJ Memo at 1.  APS contends that Martin offers "no evidentiary support" for his "outlandish conspiracy theory" and that his "unsupported allegations that APS's leadership was out to get him cannot overcome summary judgment."  MSJ Memo at 15.  According to APS, "[a]ll of Martin's claims fail as a matter of law."  MSJ Memo at 15.  APS makes four arguments.  See MSJ Memo at 15-29.

First, APS argues that Martin's age-discrimination claim under the NMHRA fails as a matter of law.  See MSJ Memo at 16.  APS argues that, because Martin has no direct proof of age discrimination, he must establish that: (i) he is a protected class member; (ii) he suffered an adverse employment action; (iii) he was qualified; and (iv) he was replaced by, or treated less favorably than, someone outside the protected classification.  See MSJ Memo at 17 (citing Martinez v. Yellow Freight Sys., Inc., 1992-NMSC-015, ¶ 8, 113 N.M. 366, 368, 826 P.2d 962, 965; Juneau v. Intel Corp., 2006-NMSC-002, ¶ 9, 139 N.M. 12, 15, 127 P.3d 548, 551).  APS alleges that Martin presents no evidence that similarly situated younger employees were treated better than he was.  See MSJ Memo at 17.  According to APS, Martin's coworkers were the same age as or older than Martin.  See MSJ Memo at 18.  In addition, APS argues that it had legitimate, non-discriminatory reasons for firing Martin, including that Martin violated "two serious safety policies," MSJ Memo at 18, and was "abrasive and aggressive" with his coworkers, MSJ Memo at 19.  APS also contends that Martin offers no evidence of pretext, because APS treated him consistently throughout his employment and "the individuals responsible for Martin's termination are in the same protected class."  MSJ Memo at 20.

Second, APS argues that Martin's claim under the NMHRA for retaliation fails as a matter

of law, because Martin "did not engage in protected opposition to discrimination under" the NMHRA, MSJ Memo at 22, and there is no causal connection between Martin's alleged protected activity and his termination, see MSJ Memo at 23-24.   APS asserts that Martin "cannot dispute" that Micatrotto did not know about Martin's complaints when she recommended that APS terminate Martin.   MSJ Memo at 24.   Similarly, APS argues that there is not sufficient evidence of temporal proximity between Martin's alleged complaint of age discrimination and his termination.   See MSJ Memo at 24.   According to APS, there is no evidence that Martin's termination was related at all to his complaints.   See MSJ Memo at 25.

Third, APS argues that Martin's common-law retaliatory discharge claim fails as a matter of law, because his complaints do not qualify as a protected activity.   See MSJ Memo at 25.   APS contends that, to prove retaliatory discharge, Martin must "'demonstrate that he was discharged because he performed an act that public policy has authorized or would encourage, or because he refused to do something required of him by his employer that public policy would condemn.'" MSJ Memo at 26 (quoting Chavez v. Manville Prods. Corp., 1989-NMSC-050 ¶ 16, 108 N.M. 643, 647, 777 P.2d 371, 375).   According to APS, Martin does not identify any "statute, regulation, or articulated public policy he claims was violated in his Complaint or during discovery," but instead only "reported what he perceived to be general safety and security issues."   MSJ Memo at 26.   APS argues that, even if Martin's complaints are protected activity, there is "no causal connection between the complaints and Martin's termination."   MSJ Memo at 26.   Moreover, APS argues that Martin identifies no evidence that his complaints relate to APS' decision to fire him. See MSJ Memo at 27.

Fourth, APS argues that, even if the Court does not grant summary judgment on all of Martin's claims, the Court should grant summary judgment on Martin's back-pay and front-pay

claims, because Martin has "not attempted to find alternate employment and has voluntarily removed himself from the workforce."  MSJ Memo at 27.  APS contends that employees have a general duty to mitigate damages and that a discharged employee must use reasonable diligence to find other suitable employment.  See MSJ Memo at 27 (citing Ford Motor Co. v. Equal Emp. Opportunity Comm'n, 458 U.S. 219, 231 (1982); Cordero Mining, LLC v. Sec'y of Labor ex rel. Clapp, 699 F.3d 1232, 1238 (10th Cir. 2012); and Gonzales v. New Mexico Dep't of Health, 2000-NMSC-029, ¶ 27, 129 N.M. 586, 595, 11 P.3d 550, 559).  According to APS, Martin "admits that he has not applied for any jobs" since APS fired him.  MSJ Memo at 28.  APS requests, therefore, that the Court grant summary judgment in its favor.

> **2.      Martin's Response.**

Martin responds to the MSJ and the MSJ Memo, arguing that the Court should not grant summary judgment in APS' favor.  See Response at 1.  Martin asserts that the relevant legal standard comes from State law, and that the courts "look to 'whether defendants made a prima facie case that no genuine issue of material act existed and, if so, whether plaintiff[s] rebutted the prima facie case.'"  Response at 8 (quoting DiMatteo v. Cnty. of Dona Ana, 1984-NMCA-108, ¶ 22, 109 N.M. 374, 379, 785 P.2d 285, 290).  Martin appears to contend that the Court should adopt the Supreme Court of New Mexico's standard that "'New Mexico courts, unlike federal courts, view summary judgment with disfavor, preferring a trial on the merits.'"  Response at 9 (quoting Romero v. Phillips, 2010-NMSC-035, ¶ 8, 148 N.M. 713, 820, 242 P.3d 280, 287).  Martin then makes four arguments contending that the Court should deny the MSJ.  See Response at 9-14.

First, Martin asserts that he makes a prima facie age-discrimination showing.  See Response at 9.  Martin alleges that the fact that he was only eighteen months from retiring with

full benefits when he was fired, along with the fact that "multiple Managers" wanted to fire him "for his reporting of safety concerns [raises] an inference of age discrimination."  Response at 9. Martin argues that the Court should not grant summary judgment on his age discrimination claim, because he had spoken with APS human resources and reported that he "believed he was being discriminated on the basis of age," and because, within a few months of reporting alleged age discrimination, he was fired "for events that had happened years ago and based on hearsay information."  Response at 9-10.  Moreover, Martin asserts that he does not have to prove that age was the only reason for his termination, but only that age was a "motivating factor."  Response at 11.

Second, Martin argues that he can establish a NMHRA retaliation claim.  See Response at 11.  Martin contends that he has established sufficient evidence to present a genuine issue of "retaliatory intent," because he shows that APS' Plant Manager "told him he was going to fire him for not getting along with his coworkers," even though Martin had reported the same co-workers for violating safety regulations and OSHA regulations, and that Martin was eighteen months from retiring with full benefits.  Response at 11.  Martin asserts his co-workers "naturally complained" about him for reporting them.  Response at 11.

Third, Martin argues that APS fired him for raising workplace safety issues, which is a protected activity.  See Response at 12.  According to Martin, "none" of his "performance issues with his co-workers started until he voiced concerns about safety issues in the workplace." Response at 12.  Martin contends that both the breaker room and welding cubicle incidents violate OSHA regulations, so APS management decided to stop using both areas, which "made his co-workers upset with him and caused his Supervisors to discipline him for doing the right thing." Response at 12.  Further, Martin asserts that he "was fired for supposedly telling a worker he could

write in his own evaluation on his Qual Card," but that he "never gave that instruction." Response at 12. Martin contends, therefore, that he "made the safety complaints in good faith and was subject to discipline and terminate as a result of his protected activity," so summary judgment is inappropriate. Response at 13.

Fourth, Martin argues that he has sought employment since APS fired him. See Response at 13. Martin contends that he has "not found suitable employment in his home area," and that he should "not be punished because he is in his late 50's and wants to stay with his place of residence and not have to move for employment." Response at 13. Moreover, Martin asserts that the Supreme Court of New Mexico concludes that a person may obtain unemployment benefits without moving to an area with better employment opportunities and that he should not be required to move to mitigate his damages. See Response at 13 (citing Parsons v. Emp. Sec. Comm'n, 1963-NMSC-007, ¶ 17, 71 N.M. 405, 411, 379 P.2d 57, 61).

**3.      APS' Reply.**

APS replies to Martin's Response, asserting that the Court should grant summary judgment in its favor, because the undisputed evidence shows that APS terminated Martin for repeated safety policy violations, and not because of his age. See Reply at 1. APS asserts that Martin was "abrasive and aggressive" towards his co-workers, which resulted in several complaints. See Reply at 1. Moreover, APS alleges that Martin does not present any evidence that his age or his alleged complaints about safety issues are linked to his termination. See Reply at 1.

First, APS asserts that Martin relies on the wrong summary judgment standard. See Reply at 1. APS contends that "the standard for granting summary judgment in state court differs from the federal court standard" and that the Court should "look to state law to determine what elements plaintiffs must prove at trial to prevail on their claims, but exclusively federal law to determine

whether plaintiffs have proved enough evidence on each of those claims to withstand summary judgment."  Reply at 2.  APS argues that the Court should apply federal summary judgment standards, and not the State law standard.  See Reply at 2.

Second, APS argues that Martin's age discrimination claim under the NMHRA fails, because there is no evidence that Martin's age motivated APS to fire him.  See Reply at 3.  APS states that Martin "fails to cite to anything in the record that would prove age was a motivating factor in his termination."  Reply at 3.  APS contends that Martin's claim that he proves a prima facie age-discrimination claim by showing that he was eighteen months from retiring with full benefits does not have merit, because, if that were the case, then "an employer could never terminate anyone over the age of 40 without the termination being viewed as discriminatory."  Reply at 3.  APS argues that Martin does not make a prima facie age discrimination case, because he must show that he "'lost out *because of his . . . age*.'"  Reply at 5 (quoting Cates v. Regents of New Mexico Inst. Of Min. & Tech., 1998-NMSC-002, ¶ 20, 124 N.M. 533, 639, 954 P.2d 65, 71)(emphasis in Reply, but not in Cates v. Regents of New Mexico Inst. Of Min. & Tech.).  Moreover, APS alleges that the evidence shows that age was "not a contributing factor" in APS' decision to terminate Martin.  Reply at 5.

Third, APS argues that Martin does not present any evidence to support his claim that there was a "causal connection between his alleged safety complaints or his alleged age discrimination complaint and his termination."  Reply at 6.  According to APS, temporal proximity between age discrimination complaints and termination is not sufficient to prove a causal connection between the asserted protected activity and termination.  See Reply at 6 (citing Anderson v. Coors Brewing Co., 181 F.3d 1171, 1179 (10th Cir. 1999), and White v. Town of Hurley, No. CIV 17-0983 JB/KRS, 2019 WL 1411135, at *35 (D.N.M. March 28, 2019)(Browning, J.)).  Moreover, APS

asserts that the undisputed facts show that there is "no causal connection" between Martin's safety complaints and APS' decision to fire him.  Reply at 7.  APS alleges that Martin's contention that his purported performance issues did not begin until after he made complaints is "completely untrue."  Reply at 7.  APS asserts that Martin's first safety report was in June, 2017, but that APS management disciplined him in 2015 for the lathe incident.  See Reply at 7-8.  APS also asserts that Martin contends that his co-workers wanted him fired, because he reported their alleged unsafe working practices, and that this contention is "unsupported," because they complained about Martin's "general communication style" and Martin's attempts to "act as their manager."  Reply at 8.  According to APS, there is no genuine dispute that Martin's alleged complaints did not cause his termination.  See Reply at 8.  Rather, APS asserts that the undisputed evidence shows that APS fired Martin for "serious, repeated policy violations."  Reply at 8.

Fourth, APS argues that, even if Martin makes a prima facie case for age discrimination or retaliation, his claims still fail, because APS had a legitimate, non-discriminatory, and non-retaliatory reason for firing Martin.  See Reply at 9.  APS contends that it fired Martin "*because* he violated safety policies in training."  Reply at 9 (emphasis in Reply).  In addition, APS asserts that there is no evidence that Martin's alleged complaints "caused APS to spend money to have a safer workplace."  Reply at 9.  APS alleges that Martin's contention that APS' stated reason for terminating him was merely a pretext for discrimination or retaliation is "unsupported," and "insufficient to overcome summary judgment," because APS "had a reasonable belief that Martin had violated a vital safety policy during training, and terminated him as a result."  Reply at 10.  APS states that it terminated Martin based on the Qual Card investigation's results.  See Reply at 10.  APS stresses the fact that Micatrotto was not aware of Martin's alleged protected activity when she recommended Martin for termination.  See Reply at 11. Moreover, APS argues that

- 31 -

Martin contends that he developed the lathe training after the incident where someone almost died, but that Martin's testimony in the Martin Depo. "does not support that statement," because "all of the testimony on that issue supports the position that Martin gave the improper instruction prior to the incident and that his instruction was the cause of the accident."  Reply at 11.  APS contends that Martin provides "no evidence of pretext."  Reply at 12.

Fifth, APS argues that Martin does not provide any evidence that he mitigated his damages. See Reply at 12.  APS contends that, if the Court does not grant summary judgment on all of Martin's claims, the Court should grant summary judgment on Martin's claim for back pay and front pay, because Martin concedes that he has not applied "for even a single job since he was terminated."  Reply at 12.  APS argues that Martin offers no evidence that shows he has tried reasonably to mitigate his damages.  See Reply at 12.

**4.    The Hearing.**

The May 24, 2021, hearing began with the Court noting that all the claims are state claims, so it presumably is exercising diversity jurisdiction.  See Draft Transcript of May 24, 2021, Hearing at 3:1-5 (taken May 24, 2021)(Court)("Tr.").[37]  Neither Martin nor APS objected or indicated any disagreement, so the Court gave APS an opportunity to argue its MSJ.  See Tr. at 3:6-8 (Court). APS began by stating that there are three separate claims in the case, all of which arise out of Martin's employment at APS.  See Tr. at 3:9-13 (Lynn).  APS argued that it employed Martin at its Four Corners facility, where he dealt with hiring new employees and training existing employees in new job duties.  See Tr. at 3:13-17 (Lynn).  APS contended that it was "of the utmost importance

---

[37]The Court's citations to the draft transcript of the hearing refer to the court reporter's original, unedited version. Any final transcript may contain slightly different page and/or line numbers.

that he provide them proper training, [and] that he instruct[] these employees regarding the safety policies that APS had."  Tr. at 3:17-20 (Lynn).

APS asserted that Martin violated two different safety policies within three years.  See Tr. at 3:21-22 (Lynn).  According to APS, the first incident was in 2015 when he instructed a trainee to use a lathe without a guard when APS policy was that the lathe should always be used with a guard, which resulted in "an employee almost being seriously injured."  Tr. at 4:2-3 (Lynn).  APS asserted that, at the time, many of its leaders wanted to terminate Martin after the lathe incident, but instead suspended him for five days, demoted him, and ultimately gave him a second chance.  See Tr. at 4:6-10 (Lynn).  APS stated that the second incident was in September, 2018, when Martin gave "improper instruction regarding the use of qualification cards, which are used by employees to show that they've completed certain tasks of their training."  Tr. at 4:12-15 (Lynn).  APS argued that, after APS conducted "an investigation and a peer review," it determined that Martin's employment "should be terminated because of these incidents."  Tr. at 4:15-17 (Lynn).  APS contended that the evidence shows that Martin was terminated because of these incidents, and that Martin's termination "was unrelated to his age or in retaliation for any complaints that he may have raised."  Tr. at 4:17-21 (Lynn).

APS turned to the summary judgment standard, asserting that Martin cites only to the State law standard, which is "very different" than the federal standard.  Tr. at 4:25 (Lynn).  According to APS, although the Court must look to State law for the claims' elements, the Court should apply the federal summary judgment standard to this case.  See Tr. at 5:1-9 (Lynn).  APS then addressed Martin's first claim, his age-discrimination claim.  See Tr. at 5:10-13 (Lynn).  APS conceded that Martin is in a protected class, because he is over forty years old.  See Tr. at 5:12-13 (Lynn).  APS asserted, however, that Martin cannot show that he was terminated because of his age and that it is

only "his belief, his own subjective belief, that he was terminated because of his age."  Tr. at 5:21-22 (Lynn).  According to APS, Martin does not point to any evidence that his termination had anything to do with his age and that there is an "inference against discrimination," because all of APS' decisionmakers who decided to fire Martin, as well as many of Martin's coworkers, are "in the same age category" as Martin.  Tr. at 5:1-9 (Lynn).  APS emphasized that it replaced Martin with somebody "right around his same age, who then retired a couple of years later" and was "not replaced by any younger employees."  Tr. at 6:14-17 (Lynn).  APS asserted that the evidence shows that it "really does value all of its employees at any ages."  Tr. at 6:21-21 (Lynn).

APS argued that, even if Martin meets his prima facie burden, APS has legitimate, nondiscriminatory reasons for firing Martin, including his two safety violations.  See Tr. at 6:24-7:21 (Lynn).  APS acknowledged that Martin disputes his two safety violations but asserted that APS conducted investigations after both incidents and determined in both cases that Martin had violated APS policies.  See Tr. at 7:6-12 (Lynn).  Moreover, APS asserted that Martin does not offer any evidence of pretext, so APS is entitled to summary judgment on Martin's first claim.  See Tr. at 7:15-25 (Lynn).

Martin then responded to APS' arguments about his age discrimination claim, contending that not all his claims are state law claims, because the State of New Mexico does not follow federal guidelines "uniformly."  Tr. at 9:4 (Gilpin).  Addressing the age discrimination claim, Martin asserted that there is pretext evidence, because Martin did not tell trainees in 2015 that they could use the lathe without a guard but told them that they need to ask a supervisor before they use a lathe without a guard.  See Tr. at 9:6-12 (Gilpin).  Regarding the second incident, Martin asserted that he told APS employees that they can "put the name of the evaluator so you can remember who evaluated you, but you can't sign off on your own qualification card."  Tr. at 9:14-18 (Gilpin).

Martin argued that he was only eighteen months from retiring, which suggests that there is pretext evidence.  See Tr. at 9:19-21 (Gilpin).  Martin then asserted that the fact that "he was making safety complaints, which was his job, and that was making a lot of his coworkers unhappy," suggests that APS discriminated against him based on his age.  Tr. at 9:23-25 (Gilpin).  Martin noted that the person who replaced Martin was around his age, but that "is not the test in New Mexico."  Tr. at 10:4-5 (Gilpin).  Martin asserted that the test for age discrimination in New Mexico is: "was it cause of his age or was it because of other issues?"  Tr. at 10:4-5 (Gilpin).

The Court then asked Martin to clarify whether he is only bringing State law claims and whether the Court is exercising diversity jurisdiction in this case.  See Tr. at 10:8-21 (Court).  Martin responded that he is only bringing State law claims and that the parties are diverse.  See Tr. at 10:17-23 (Gilpin).  The Court then asked Martin whether there are any factual disputes regarding the age discrimination claim, because it seems that the dispute is how the facts are characterized.  See Tr. at 11:2-8 (Court).  Martin responded that he sees a factual dispute "about the interpretation of what was said in the investigations."  Tr. at 11:10-11 (Gilpin).  Martin asserted that he did not violate any APS policy, because, "[i]n his mind, when he was doing the training, he was telling the instructions . . . that if you're going to take of[f] the guards, you have to have a supervisor there."  Tr. at 11:13-16 (Gilpin).  Martin contended that it is undisputed that he did not tell trainees that they can take off the lathe guards off whenever they want.  Tr. at 11:18-22 (Gilpin).

APS countered, asserting that the pretext issues apply to all of Martin's claims.  See Tr. at 12:7-9 (Lynn).  APS asserted that the "vast majority of the facts are undisputed," meaning that, even if the Court accepts Martin's version of the facts, he "still fails to meet the requisite legal standard."  Tr. at 12:22-23 (Lynn).  On the pretext issue specifically, APS contended that APS' position is that "these lathes should never be used without the guards," meaning that "we have a

difference of opinion between what Mr. Martin thought was appropriate in the instruction and what the company thought was appropriate in the instruction." Tr. at 13:6-9 (Lynn). APS stated that it did an investigation and understood Martin's contention, but simply "disagreed with him," because what he told trainees "is still against company policy." Tr. at 13:12-14 (Lynn). APS noted that "the employee who was involved in the accident actually had discussed the issue with his supervisor and gotten permission to use this lathe without a guard," and that "this was still a violation of company policy." Tr. at 13:15-21 (Lynn).

Regarding the second, Qual Card incident, APS asserted that the "same issue occurred." Tr. at 14:3 (Lynn). APS argued that Martin testified that he told trainees "if they couldn't get the supervisor or the person who was doing the qualification to sign off on their card, that they could quote, 'record,' [unquote] who that person was and then take that to their supervisor to let them know." Tr. at 14:5-10 (Lynn)(no citation for quotation). According to APS, Martin never specified whether trainees should "record that on their card or whether they should write," and Martin "admitted at this deposition that it would cause confusion if trainees were recording these names on the actual qualification card," but "that's what happened." Tr. at 14:11-15 (Lynn). APS argued that, after its investigation, it concluded that Martin's instructions caused this confusion among the trainees, and caused one trainee to record the names supervisors or evaluators on the qual card, which violated APS policy. See Tr. at 14:16-23 (Lynn). APS asserted that there is no genuine dispute of material fact here, because Martin's "subjective belief" is "insufficient to overcome summary judgment." Tr. at 15:6-10 (Lynn).

APS then turned to Martin's second claim: the retaliation claim. See Tr. at 15:11 (Lynn). APS asserted that Martin's retaliation claim arises out of a situation where Martin "claims that he reported age discrimination to HR about three and a half months before he was terminated," and

complained that Goodman discriminated against him.  Tr. at 15:13-16 (Lynn).  According to APS,

when Martin was questioned at his deposition, he conceded that he never complained of age

discrimination, but asserted that he complained that "he thought Mr. Goodman was too hard on

him" and did not "treat[] him fairly."  Tr. at 15:19-24(Lynn).  As a result, APS contended that there

is no protected activity under the NMRA.  See Tr. at 16:4-7 (Lynn).  APS asserted that, additionally,

there is no evidence that Goodman knew that Martin had complained of age discrimination, so there

is no way he could have retaliated against Martin for his complaint.  See Tr. at 16:8-13 (Lynn).  In

response to the Court's question, APS stated that it does not have a cat's paw theory.[38]  See Tr. at

16:14-21 (Court, Lynn).  Moreover, APS argues that nobody who reported to Goodman knew of

Martin's alleged complaint.  See Tr. at 16:22-17:4 (Lynn).  APS contended that Micatrotto, who

investigated the Qual Card incident and was Goodman's manager, was not aware of Martin's

complaint when she was doing the investigation and recommending Martin for termination.  See

Tr. at 17:5-18 (Lynn).  APS explained that, as part of its termination process, it conducts what it

calls a "peer review."  Tr. at 17:19-21 (Lynn).  APS asserted that Goodman, Badrog, Susag, and

Nicosia were at Martin's peer review, but none of them knew about Martin's alleged complaint.

See Tr. at 16:22-17:5 (Lynn).  APS stated that Martin contends that he made a second, subsequent

---

[38]The Tenth Circuit has adopted the "cat's paw theory," which, in this context, "refers to a situation in which a biased subordinate, who lacks decisionmaking power, uses the formal decisionmaker as a dupe in a deliberate scheme to trigger a discriminatory employment action." E.E.O.C. v. BCI Coca-Cola Bottling Co. of L.A., 450 F.3d 476, 484 (10th Cir. 2006)(citing Llampallas v. Mini-Circuits, Lab, Inc., 163 F.3d 1236, 1249 (11th Cir. 1998)). This theory, however, does not make the subordinate employee liable; rather, it provides a circumstance in which "'a defendant may be held liable for a subordinate employee's prejudice even if the manager lacked discriminatory intent.'" E.E.O.C. v. BCI Coca-Cola Bottling Co. of L.A., 450 F.3d at 485. Thus, this theory cannot be used to conclude that an employee is liable for discriminatory discharge under NHMRA, but can be used to hold a defendant liable when a manager follows the biased recommendation of a subordinate without investigating the complaint against the employee. See E.E.O.C. v. BCI Coca-Cola Bottling Co. of L.A., 450 F.3d at 485.

complaint to Clines about Goodman, because Goodman allegedly had retaliated against Martin by scheduling an employee retreat around the same time that Martin was scheduled to give a speech that was not directly work related.  See Tr. at 18:6-12 (Lynn).  According to APS, it concluded that Goodman did not retaliate against Martin in that instance, none of the people at Martin's peer review knew about Martin's other complaint, and none of them took it into consideration when they decided to fire Martin.  See Tr. at 18:12-20 (Lynn).  In addition, APS asserted that, even if Martin alleges a prima facie retaliation case, APS has "legitimate, nonretaliatory reasons for terminating him" and that "there is simply no evidence of pretext."  Tr. at 18:23-25 (Lynn).

Martin then addressed his retaliation claim, alleging that he complained to Goodman several months before APS fired him about Goodman singling him out and treating him differently.  See Tr. at 19:8-11 (Gilpin).  Martin alleged that, in previous conversations, Goodman told Martin that he was going to fire Martin, and that the people whom Martin was reporting for safety violations are the same people who complained to Goodman.  See Tr. at 19:11-19 (Gilpin).  Martin reiterated his assertion that he complained "a few months" before APS terminated him and argued the New Mexico courts did not adopt the "three month standard that was adopted in the federal courts."  See Tr. at 20:1-3 (Gilpin).

The Court asked Martin whether there is any evidence in the record that Martin raised safety issues.  See Tr. at 20:7-16 (Court).  Martin alleged that he made safety complaints on two occasions: the breaker-room incident, when he complained that the break room was dangerous, and the welding-cubicles incident, when he closed off the cubicles and reported to the fire marshal that the welding cubicles were dangerous.  See Tr. at 20:18-21:9 (Gilpin).  APS then offered rebuttal on the retaliation claim, contending that Martin is mixing two separate retaliation claims.  See Tr. at 20:1-3 (Gilpin).  According to APS, Martin's claim for retaliation based on his age falls under the

- 38 -

NMHRA and there is "no evidence to support [Martin's claim that] he was terminated for . . . allegedly reporting age discrimination." Tr. at 22:17-19 (Lynn).  APS asserted that Martin's second claim for retaliation for his safety complaints is a "common law retaliation claim," and that, to prevail, Martin must "show that he reported a violation of some statute or regulation or public policy, and that he was then terminated for that," but, APS argued, "there is simply no evidence of that." Tr. at 22:23-24:2 (Lynn).  APS contended that there is no evidence that Martin's breaker-room complaint is related to his termination.  See Tr. at 23:20-21 (Lynn).  Rather, APS argued, Martin's coworkers complained because Martin was "abrasive in his style, he was aggressive." Tr. at 23:24 (Lynn).  APS stated that there is a similar issue with the welding cubicles, namely, that "a couple of welders complained a little bit about it, but that was the end of it," and that the "issue was resolved." Tr. at 24:15-17 (Lynn).

Moreover, APS contended that Martin admitted that he made all of his safety complaints over a year before APD fired him, meaning that there is "absolutely no temporal proximity between these complains and his termination." Tr. at 24:25-25:1 (Lynn).  APS also noted that Martin is offering "[v]arious shifting theories for why his coworkers did not like him," because, in the Martin Depo., Martin asserted that "his coworkers did not like him because he was white." Tr. at 25:8-9 (Lynn).  APS, however, alleged that "all the evidence in the record was that they didn't get along because of Mr. Martin's communication style." Tr. at 25:12-14 (Lynn).  The Court asked what justification Martin has for interrupting a training class and telling one of his peers to stop the class.  See Tr. at 25:20-22 (Court).  APS responded that Martin's justification is "that [the] training that he was working with had raised some questions about instruction that other trainees had received," and Martin "wanted the training to all be uniform and consistent." Tr. at 25:23-26:26:5 (Lynn).  According to APS, Martin's decision to stop the training class had "nothing to do with any sort of

safety issues or anything in that regard."  Tr. at 26:12-13 (Lynn).  Moreover, APS noted that "the majority of the people who were involved in this peer review that led to Martin's termination didn't even know about these safety complaints."  Tr. at 22:23-24:2 (Lynn).  APS argued that Martin's contention that Goodman wanted him fired is not relevant, because "that occurred before Mr. Martin had made any safety complaints."  Tr. at 27:8-9 (Lynn).  APS closed its argument about the retaliation claims by noting that, even if Martin can show a prima facie discrimination case, APS has legitimate reasons for terminating Martin and Martin has no evidence of pretext.  See Tr. at 27:17-19 (Lynn).

Martin responded to APS' arguments, asserting that Martin's breaker room complaint "has to do with OSHA laws" and that Martin's welding-cubicle complaint "was because of the fire hazard they imposed on the plant."  Tr. at 28:2-72 (Gilpin).  Martin also noted that he raised complaints about high-school students wandering around the plant, and that "these complaints weren't well received by his peers, and those were the ones who made complaints to Mr. Goodman . . . that they didn't like him because he was, in their mind, aggressive, and I guess didn't have good communication skills."  Tr. at 28:14-19 (Gilpin).  Regarding the training class that he interrupted, Martin contended that, when he interrupted, the class was talking in small groups, and Martin walked up to the instructor and "made the comment that they maybe should get on the same page and that he needed to talk to" Susag about the training, so that all trainings were.  Tr. at 29:1-2 (Gilpin).  Martin asserted that he "wasn't like: This is how we're going to do it; this is the way," but was "simply making a statement that he thought they should be on the same page."  Tr. at 29:5-8 (Gilpin).  Regarding the safety issues, Martin argued that they are "issues of public importance, that require him to come in himself and say that these welding cubicles were a hazard."  Tr. at 29:9-12 (Gilpin).  Martin stated that his complaints "made a lot of his coworkers upset" and that "those

were the people who complained to Mr. Goodman."  Tr. at 29:20-22 (Gilpin).  Martin then addressed his peer review, alleging that there were some "other individuals from outside the plant" at the peer review, but that they "weren't the ones that were doing the talking" and were "just neutral people who did now know the situation at all," meaning that they would not "qualify as being objective."  Tr. at 29:25-30:8 (Gilpin).  The Court asked whether "both sides are submitting their opinions as to why he was terminated."  Tr. at 30:15-16 (Court).  Martin responded that "several managers testified that people had complained about him recording," and that it "came from both sides."  Tr. at 30:19-22 (Gilpin).

APS asserted that the evidence shows that the unsupervised high-school students about whom Martin complained about were not an issue, because Susag "immediately contacted the high school and addressed the issue," and that there "was never any evidence that this had anything to do with complaints that were received, or his termination."  Tr. at 31:6-12 (Lynn).  APS reiterated that, when it makes firing decisions, it "has to take into account complaints that have been made by his coworkers," and that Martin's coworkers "never complained that Mr. Martin had reported safety violations," but, rather, that "the issue had always been the way Mr. Martin went about communicating and working with his coworkers."  Tr. at 32:6-10 (Lynn).  APS argued that Martin "was terminated because he did commit serious safety violations in two different trainings."  Tr. at 32:14-16 (Lynn).  APS further argued that, regarding Martin's allegation that Goodman and Susag were speaking at the peer review, there is "no evidence that that was the case," noting that Martin was not at the peer review.  Tr. at 32:25 (Lynn).

The parties then turned to the mitigation issue.  See Tr. at 33:18-19 (Court).  APS asserted that Martin alleges that he has applied for only one job since APS fired him, which does not meet the damage mitigation standard.  See Tr. at 33:25-34:5 (Lynn).  APS contended that, even if

Martin's claims remain, his "claims for backpay and frontpay should be cut off because he has not demonstrated that he's made reasonable efforts to find other employment."  Tr. at 34:6-9 (Lynn). Martin countered, noting that Martin has been "looking for work around this area," because he owns a home, and his wife and family live there, and that he "has the right to look for employment where he doesn't have to move."  Tr. at 34:20-21 (Gilpin).  APS asserted that it is not suggesting that Martin be required to move, but that it has "not seen any evidence indicating that he's searched for work even in that area."  Tr. at 35:11-12 (Lynn).  After the parties discussed scheduling and mediation, the hearing adjourned.  See Tr. at 36:15-40:23 (Lynn, Court, Gilpin).

## LAW REGARDING SUMMARY JUDGMENT

Rule 56(a) of the Federal Rules of Civil Procedure states: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "The movant bears the initial burden of 'show[ing] that there is an absence of evidence to support the nonmoving party's case.'"  Herrera v. Santa Fe Pub. Schs., 956 F. Supp. 2d 1191, 1221 (D.N.M. 2013)(Browning, J.)(quoting Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991)(alteration in Herrera v. Santa Fe Pub. Schs.)).  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)("Celotex").

> Before the court can rule on a party's motion for summary judgment, the moving party must satisfy its burden of production in one of two ways: by putting evidence into the record that affirmatively disproves an element of the nonmoving party's case, or by directing the court's attention to the fact that the non-moving party lacks evidence on an element of its claim, "since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  Celotex, 477 U.S. at 323-25.  On those issues for which it bears the burden of proof at trial, the nonmovant "must go beyond the pleadings and designate specific facts to make a showing sufficient to establish the existence of an element essential to his case in order to survive summary judgment."  Cardoso v. Calbone, 490 F.3d 1194, 1197 (10th Cir. 2007)(internal quotations and brackets omitted).

Plustwik v. Voss of Nor. ASA, No. 11-CV-0757 DS, 2013 WL 1945082, at *1 (D. Utah May 9, 2013)(Sam, J.)(emphasis added).  "If the *moving* party will bear the burden of persuasion at trial, that party must support its motion with credible evidence -- using any of the materials specified in Rule 56(c) -- that would entitle it to a directed verdict if not controverted at trial." Celotex, 477 U.S. at 331 (Brennan, J., dissenting)(emphasis in original).[39]  Once the movant meets this burden, rule 56 requires the nonmoving party to designate specific facts showing that there is a genuine issue for trial.  See Celotex, 477 U.S. at 324; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)("Liberty Lobby").  In American Mechanical Solutions, LLC v. Northland Piping, Inc., 184 F. 3d 1030 (D.N.M. 2016)(Browning, J.), the Court granted summary judgment for the defendant when the plaintiff did not offer expert evidence supporting causation or proximate causation in its breach-of-contract or breach-of-the-implied-warranty-of-merchantability claims. 184 F. 3d at 1075-78.  The Court reasoned that the plaintiff could prove neither the breach-of-contract claim's causation requirement nor the breach-of-the-implied-warranty-of-merchantability claim's proximate-causation requirement with mere common knowledge, and so New Mexico law required that the plaintiff bolster its arguments with expert testimony, which the plaintiff had not provided.  See 184 F. Supp. 3d at 1067, 1073, 1075, 1079.  The Court determined that, without the requisite evidence, the plaintiff failed to prove "an essential element of the nonmoving party's case," rendering "all other facts immaterial."  184 F. Supp. 3d at 1075 (internal quotation marks omitted)(quoting Plustwik v. Voss of Nor. ASA, 2013 WL 1945082, at *1).

---

[39]Although the Honorable William J. Brennan, Jr., then-Associate Justice of the Supreme Court, dissented in Celotex, this sentence is widely understood to be an accurate statement of the law.  See 10A Charles Allen Wright & Arthur R. Miller, Federal Practice and Procedure § 2727, at 470 (3d ed. 1998)("Although the Court issued a five-to-four decision, the majority and dissent both agreed as to how the summary-judgment burden of proof operates; they disagreed as to how the standard was applied to the facts of the case.")

Thus, if a plaintiff has the burden of proof, and the plaintiff has no competent evidence, the defendant, even without any competent evidence itself, may secure summary judgment by pointing out the plaintiff's lack of competent evidence. See Celotex, 477 U.S. at 323-25 (providing that summary judgment is proper where a plaintiff lacks evidence on an essential element of its case); Am. Mech. Sols., LLC v. Northland Piping, Inc., 184 F. Supp. 3d at 1075 (granting summary judgment because plaintiff lacked evidence on causation); Morales v. E.D. Entyre & Co., 382 F. Supp. 2d 1252, 1272 (D.N.M. 2005)(Browning, J.)(granting summary judgment because plaintiff lacked competent evidence that the defendants defectively manufactured an oil distributor). A conclusory assertion that the plaintiff lacks evidence is insufficient, however, to secure summary judgment; the defendant must make some evidentiary showing that the plaintiff lacks competent evidence. See Halley v. Huckaby, 902 F.3d 1136, 1143 (10th Cir. 2018)(stating that summary judgment may be warranted if the movant notes a lack of evidence for an essential element of the claim). See also 11 James Wm. Moore et al., Moore's Federal Practice § 56.40[1][b][iv], at 56-109 to -111 (3d ed. 2018).

The party opposing a motion for summary judgment must "set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990). See Vitkus v. Beatrice Co., 11 F.3d 1535, 1539 (10th Cir. 1993)("However, the nonmoving party may not rest on its pleadings but must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." (internal quotation marks omitted)). Rule 56(c)(1) provides: "A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations,

stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . . ."  Fed. R. Civ. P. 56(c)(1)(A).  It is not enough for the party opposing a properly supported motion for summary judgment to "rest on mere allegations or denials of his pleadings." Liberty Lobby, 477 U.S. at 259.  See Abercrombie v. City of Catoosa, 896 F.2d 1228, 1231 (10th Cir. 1990); Otteson v. United States, 622 F.2d 516, 519 (10th Cir. 1980)("[O]nce a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried." (quoting Coleman v. Darden, 595 F.2d 533, 536 (10th Cir. 1979)).

A party cannot "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation." Colony Nat'l Ins. v. Omer, No. 07-2123-JAR, 2008 WL 2309005, at *1 (D. Kan. June 2, 2008)(Robinson, J.)(citing Fed. R. Civ. P. 56(e); Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1199 (10th Cir. 2006)(McConnell, J.)).  "In responding to a motion for summary judgment, 'a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial.'" Colony Nat'l Ins. v. Omer, 2008 WL 2309005, at *1 (quoting Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988)).  To deny a motion for summary judgment, genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Liberty Lobby, 477 U.S. at 250.  A mere "scintilla" of evidence will not avoid summary judgment. Vitkus v. Beatrice Co., 11 F.3d at 1539 (citing Liberty Lobby, 477 U.S. at 248).  Rather, there must be sufficient evidence on which the fact finder could reasonably find for the nonmoving party.  See Liberty Lobby, 477 U.S. at 251 (quoting Schuylkill & Dauphin Improvement Co. v. Munson, 81 U.S. (14 Wall.) 442, 448

(1871)("Schuylkill")); Vitkus v. Beatrice Co., 11 F.3d at 1539.  "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. [First Nat. Bank of Ariz. v.] Cities Service,[] 391 U.S. [253], 288-[89] . . . . If the evidence is merely colorable, Dombrowski v. Eastland, 387 U.S. 82, 87 . . . (per curiam), or is not significantly probative, Cities Service, . . . at 290 . . . summary judgment may be granted."  Liberty Lobby, 477 U.S. at 249 (citations omitted).  Where a rational trier of fact, considering the record as a whole, cannot find for the nonmoving party, "there is no 'genuine issue for trial.'"  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)(quoting First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 289 (1968)).

When reviewing a motion for summary judgment, the court should keep in mind certain principles.  First, the court's role is not to weigh the evidence but to assess the threshold issue whether a genuine issue exists as to material facts requiring a trial.  See Liberty Lobby, 477 U.S. at 249.  Second, the ultimate standard of proof is relevant for purposes of ruling on a summary judgment, such that, when ruling on a summary judgment motion, the court must "bear in mind the actual quantum and quality of proof necessary to support liability."  Liberty Lobby, 477 U.S. at 254.  Third, the court must resolve all reasonable inferences and doubts in the nonmoving party's favor and construe all evidence in the light most favorable to the nonmoving party.  See Hunt v. Cromartie, 526 U.S. 541, 550-55 (1999); Liberty Lobby, 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970)).  Fourth, the court cannot decide any credibility issues.  See Liberty Lobby, 477 U.S. at 255.

There are, however, limited circumstances in which the court may disregard a party's version of the facts.  This doctrine developed most robustly in the qualified-immunity arena.  In

- 46 -

Scott v. Harris, 550 U.S. 372 (2007), the United States Supreme Court concluded that summary judgment is appropriate where video evidence clearly contradicted the plaintiff's version of the facts. See 550 U.S. at 378-81. The Supreme Court explained:

> At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts. Fed. Rule Civ. Proc. 56(c). As we have emphasized, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. [at] 586-587 . . . (footnote omitted). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. [at] 247-248 . . . . When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.
>
> That was the case here with regard to the factual issue whether respondent was driving in such fashion as to endanger human life. Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him. The Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape.

Scott v. Harris, 550 U.S. at 380-81 (alterations in Scott v. Harris)(emphasis in Liberty Lobby).

The Tenth Circuit applied this doctrine in Thomson v. Salt Lake County, 584 F.3d 1304 (10th Cir. 2009), and explained:

> [B]ecause at summary judgment we are beyond the pleading phase of the litigation, a plaintiff's version of the facts must find support in the record: more specifically, "[a]s with any motion for summary judgment, '[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts[.]'" York v. City of Las Cruces, 523 F.3d 1205, 1210 (10th Cir. 2008)(quoting Scott, 550 U.S. at 380); see also Estate of Larsen ex rel. Sturdivan v. Murr, 511 F.3d 1255, 1258 (10th Cir. 2008).

Thomson v. Salt Lake Cty., 584 F.3d at 1312 (second alteration in Thomson v. Salt Lake Cty., third and fourth alterations in York v. City of Las Cruces). "The Tenth Circuit, in *Rhoads v. Miller*,

[352 F. App'x 289 (10th Cir. 2009),] explained that the blatant contradictions of the record must be supported by more than other witnesses' testimony." Lymon v. Aramark Corp., 728 F. Supp. 2d 1222, 1249 (D.N.M. 2010)(Browning, J.), aff'd, 499 F. App'x 771 (10th Cir. 2012)(unpublished).[40]

Parties may allege new claims in motions for summary judgment. See Evans v. McDonald's Corp., 936 F.2d 1087, 1090-91 (10th Cir. 1991). When a party raises a new claim in a motion for summary judgment, a court treats the motion for summary judgment as a request to amend the complaint pursuant to rule 15 of the Federal Rules of Civil Procedure. See Viernow v. Euripides Dev. Corp., 157 F.3d 790 n.9 (10th Cir. 1998). The Tenth Circuit has stated:

> [a]s a general rule, a plaintiff should not be prevented from pursuing a valid claim just because she did not set forth in the complaint a theory on which she could recover, "provided always that a late shift in the thrust of the case will not prejudice the other party in maintaining his defense upon the merits."

Evans v. McDonald's Corp., 936 F.2d at 1090-91 (quoting 4 Charles Alan Wright & Arthur Miller, Federal Practice and Procedure § 1219, at 94 (4th ed. 2021)("Wright & Miller")). While the

---

[40] Anderson v. Clovis Municipal Schools is an unpublished opinion, but the Court can rely on an Tenth Circuit unpublished opinion to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A)("Unpublished decisions are not precedential, but may be cited for their persuasive value."). The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . And we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005). The Court concludes that Anderson v. Clovis Municipal Schools, Robinson v. Cavalry Portfolio Servs., LLC, 365 F. App'x 104 (10th Cir. 2010)(unpublished), Held v. Ferrellgas, Inc., 505 F. App'x 687 (10th Cir. 2012), Cordova v. PNM Elec. And Gas Servs., 72 F. App'x 789, 793 (10th Cir. 2003), and Lymon v. Aramark Corp., 499 F. App'x 771 (10th Cir. 2012), have persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion and Order.

purpose of "fact pleading" is to give defendants fair notice of claims against them "without requiring the plaintiff to have every legal theory or fact developed in detail before the complaint is filed and the parties have opportunity for discovery," plaintiffs may not "wait until the last minute to ascertain and refine the theories on which they intend to build their case." Evans v. McDonald's Corp., 936 F.2d at 1091.

### LAW REGARDING THE NMHRA

The NMHRA, which is administered by the Human Rights Division and the New Mexico Human Rights Bureau, makes it an unlawful discriminatory practice for

> an employer, unless based on a bona fide occupational qualification or other statutory prohibition, to refuse to hire, to discharge, to promote or demote or to discriminate in matters of compensation, terms, conditions or privileges of employment against any person otherwise qualified because of race, age, religion, color, national origin, ancestry, sex, physical or mental handicap or serious medical condition, or, if the employer has fifty or more employees, spousal affiliation; provided, however, that 29 U.S.C. Section 631(c)(1) and (2) shall apply to discrimination based on age; or, if the employer has fifteen or more employees, to discriminate against an employee based upon the employee's sexual orientation or gender identity[.]

N.M.S.A. § 28-1-7A. The NMHRA allows individuals to bring a lawsuit in the appropriate district court after exhausting their administrative remedies. See Luboyeski v. Hill, 1994-NMSC-032, ¶ 7, 872 P.2d 353, 355. The NMHRA sets out the same standard for establishing wrongful discrimination as Title VII. See Orr v. City of Albuquerque, 417 F.3d 1144, 1149 n.5 (10th Cir. 2005)("Plaintiffs' burden under the NMHRA is identical to their burden under Title VII."); Lobato v. N.M. Env't Dep't, 733 F.3d 1283, 1296-97 (10th Cir. 2013)(holding that, "because we conclude that Lobato has no Title VII claim, we also conclude he has no NMHRA claim"). The NMHRA requires an individual to first exhaust his or her administrative remedies before bringing a lawsuit. See Luboyeski v. Hill, 1994-NMSC-032, ¶ 7, 872 P.2d at 355; Bates v. N.M. Corr. Dep't, No. CIV 08-1013, 2010 WL 4339367, at *7 (D.N.M. Sept. 30, 2010)(Browning, J.)("NMHRA claims must

be administratively exhausted before being brought in federal court."). The NMHRA provides:

> A person aggrieved by an order of the commission may obtain a trial de novo in the district court of the county where the discriminatory practice occurred or where the respondent does business by filing a notice of appeal within ninety days from the date of service of the [New Mexico Human Rights] commission's order.

N.M.S.A. § 28-1-13A.

The Supreme Court of New Mexico applies the framework that the Supreme Court of the United States established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), "[w]hen considering a violation of the NMHRA." Juneau v. Intel Corp., 2006-NMSC-002, ¶ 9, 127 P.3d 548, 551. The Supreme Court of New Mexico has stated that, "when considering claims under the NMHRA, we may look at federal civil rights adjudication for guidance in interpreting the NMHRA. Our reliance on the methodology developed in the federal courts, however, should not be interpreted as an indication that we have adopted federal law as our own." Ocana v. Am. Furniture Co., 2004-NMSC-018, ¶ 23, 91 P.3d 58, 68 (internal quotation marks omitted)(citations omitted). "[C]laims of age, race, national origin, gender discrimination, and retaliation are all subject to the burden shifting framework that the Supreme Court established in McDonnell Douglas Corp. v. Green." Gamez v. Country Cottage Care and Rehab., 377 F. Supp. 2d 1103, 1119 (D.N.M. 2005)(citing McDonnell Douglas Corp. v. Green, 411 U.S. at 802-804). Under the McDonnell Douglas Corp. v. Green framework, a plaintiff must set forth a prima-facie case of discrimination. See Kelley v. City of Albuquerque, 375 F. Supp. 2d 1183, 1210 (D.N.M. 2004)(Browning, J.). If the plaintiff establishes a prima-facie case for any of his discrimination claims, "the burden shifts to the defendant to come forward with a legitimate nondiscriminatory reason for its employment related decision." McDonnell Douglas Corp. v. Green, 411 U.S. at 802. "Upon the employer's articulation of a legitimate, nondiscriminatory reason . . . the presumption of discrimination established by the prima facie case simply drops out of the picture." Kelley v.

City of Albuquerque, 375 F. Supp. 2d at 1210 (internal quotations omitted). The plaintiff then must present evidence that the defendant's proffered reason for the employment decision was pretextual. See Kelley v. City of Albuquerque, 375 F. Supp. 2d at 1210 (citing Kendrick v. Penske Transp. Servs., Inc., 220 F.3d 1220, 1230 (10th Cir. 2000)). The Supreme Court of New Mexico has stated that the framework it applies to discrimination claims under the NMHRA is as follows: "[A]n employee bears the initial burden of demonstrating a prima facie case of discrimination, which then shifts the burden to the employer to provide a legitimate, non-discriminatory reason for the adverse employment action. The employee then has the opportunity to rebut the employer's proffered reason as pretextual or otherwise inadequate." Juneau v. Intel Corp., 2006-NMSC-002, ¶ 9, 127 P.3d at 551 (citing McDonnell Douglas Corp. v. Green, 411 U.S. at 802-05). This approach is the same as the McDonnell Douglas Corp. v. Green framework.

While New Mexico uses federal law to interpret the NMHRA, there may be two ways in which the NMHRA is broader than federal law. First, as this Court has previously acknowledged, the Supreme Court of New Mexico allows for personal liability under the NMHRA. See Duprey v. Twelfth Judicial Dist. Court, No. CIV 08-0756 JB, 2009 WL 2482170, at *7 (D.N.M. July 28, 2009)(Browning, J.). The NMHRA defines "employer" as "any person employing four or more persons and any person acting for an employer." N.M.S.A. § 28-1-2B. While acknowledging that there is generally no personal liability under Title VII, the Supreme Court of New Mexico has "reject[ed] the proposition that there can exist no individual liability under the NMHRA." Sonntag v. Shaw, 2001-NMSC-015, ¶ 13, 130 N.M. 238, 243, 22 P.3d 1188, 1193. In Sonntag v. Shaw, a defendant relied on Title VII case law to argue that employees cannot sue a corporation's owner in the owner's individual capacity under the NMHRA. See 2001-NMSC-015, ¶ 13, 130 N.M. at 243, 22 P.3d at 1193. Although it held that the defendant could not be held personally liable, given

that the plaintiff had failed to exhaust administrative remedies, the Supreme Court of New Mexico

declined to close the door on individual liability under the NMHRA.  See 2001-NMSC-015, ¶ 13,

22 P.3d at 1193.  The Supreme Court of New Mexico noted:

> [T]his Court has acknowledged the possibility of individual liability for
> discrimination claims.  Cf. Luboyeski v. Hill, 117 N.M. 380, 382, 872 P.2d 353,
> 355 (1994)(affirming the dismissal of individual defendants because the plaintiff
> failed to exhaust administrative remedies against them); Mitchell-Carr v.
> McLendon, 1999-NMSC-025, ¶ 10, 127 N.M. 282, 980 P.2d 65 (citing Luboyeski).
> As Plaintiff suggests, the potential for individual liability for discrimination claims
> is rooted in the language of the NMHRA itself, which forbids "any person" from
> supporting a discriminatory practice.  Section 28-1-7(i); see N.M.S.A. 1978, § 28-
> 1-2(A) (1993)(including within its definition of "person" for purposes of the
> NMHRA, "one or more individuals").

2001-NMSC-015, ¶ 12, 130 N.M. at 243, 22 P.3d at 1193.  Second, the NMHRA's definition of

"serious medical condition," N.M.S.A. § 28-1-7, may be broader in scope than the ADA's

definition of disability.  See Clayton v. Pioneer Bank, No. CIV 07-0680 JB/LAM, 2008 WL

5787472, at *17-18 (D.N.M. December 31, 2008)(Browning, J.)(recognizing that, although "the

terms 'medical condition' under the NMHRA, and 'disability,' under the ADA, may be

interchangeable in some cases[,]" they may not be the same in others).

## LAW REGARDING RETALIATION CLAIMS

"A claim of retaliation is a distinct allegation of an unlawful employment practice."

Duncan v. Mgr., Dep't of Safety, City & Co. of Denver, 397 F.3d 1300, 1314 (10th Cir. 2005).  A

Title VII plaintiff must "exhaust administrative remedies for each individual discriminatory or

retaliatory act."  Martinez v. Potter, 347 F.3d 1208, 1211 (10th Cir. 2003).  To succeed on a claim

of retaliation, a plaintiff must show: (i) she engaged in protected activity; (ii) she suffered an

adverse employment action; and (iii) there was a causal connection between the protected activity

and the adverse action.  See O'Neal v. Ferguson Constr. Co., 237 F.3d 1248, 1252 (10th Cir. 2001).

An adverse employment action "must be materially adverse to the employee's job status. . . .  The

adverse action must amount to a significant change in employment status, such as firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Meiners v. Univ. of Kan., 359 F.3d 1222, 1230 (10th Cir. 2004)(internal quotation marks omitted)(citations omitted).

In Duncan v. Mgr., Dep't of Safety, City & Co. of Denver, 397 F.3d 1300 (10th Cir. 2005), the plaintiff alleged a series of acts that she stated were in retaliation for her use of the internal-affairs complaint process. See 397 F.3d at 1314. These acts included the failure to receive backup, an angry outburst by a lieutenant during an internal affairs investigation, and her general ostracization by other officers. See Duncan v. Mgr., Dep't of Safety, City & Co. of Denver, 397 F.3d at 1314. The Tenth Circuit found: "None of the actions alleged by Ms. Duncan before April 14, 1998 materially affected her employment status. These acts may have made her work environment unpleasant, but they are insufficient to support a retaliation claim." Duncan v. Mgr., Dep't of Safety, City & Co. of Denver, 397 F.3d at 1314. The Tenth Circuit noted that the plaintiff had identified one act severe enough to be an adverse employment action to satisfy the second prong for retaliation -- she was transferred to the police academy in retaliation for filing her original EEOC charge; however, the Tenth Circuit found that she failed to file a separate EEOC charge detailing the plausibly adverse action, and thus the district court properly dismissed her retaliation claim. See Duncan v. Mgr., Dep't of Safety, City & Co. of Denver, 397 F.3d at 1314.

"[T]he absence of a reference to unlawful discrimination . . . can preclude a retaliation claim because an employer cannot engage in unlawful retaliation if it does not know that the employee has opposed or is opposing a violation of Title VII." Petersen v. Utah Dep't of Corr., 301 F.3d 1182, 1188 (10th Cir. 2002). See Pope v. ESA Servs., Inc., 406 F.3d 1001, 1010 (8th Cir. 2005)(holding, that, in Title VII retaliation case, an employee's comments about the absence

of black managers did not constitute protected activity, because employee failed to attribute the absence of managers to racial discrimination); Trammel v. Simmons First Bank of Searcy, 345 F.3d 611, 615 (8th Cir. 2003)(holding that ADEA plaintiff's letter-writing campaign accusing employer of improper loan procedures was not protected activity, because the letters were not written to oppose age discrimination); Barber v. CSX Distrib. Serv's., 68 F.3d 694, 701 (3d Cir. 1995)(holding that employee's ADEA retaliation claim failed, because employee's criticism of employer's selection of a less qualified, younger applicant for a job, without specifically complaining about age discrimination, did not constitute protected conduct).

## LAW REGARDING ERIE AND THE RULES ENABLING ACT

"In diversity cases, the Erie[41] doctrine instructs that federal courts must apply state substantive law and federal procedural law." Racher v. Westlake Nursing Home Ltd. P'ship, 871 F.3d 1152, 1162 (10th Cir. 2017). "If a federal rule of civil procedure answers the question in dispute, that rule governs our decision so long as it does not 'exceed[ ] statutory authorization or Congress's rulemaking power.'" Racher v. Westlake Nursing Home Ltd. P'ship, 871 F.3d at 1162 (quoting Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins., 559 U.S. 393, 398 (2010)("Shady Grove")). "When faced with a choice between a state law and an allegedly conflicting federal rule," the Tenth Circuit "follow[s] the framework described by the Supreme Court in [Shady Grove], as laid out by Justice Stevens in his concurring opinion." Racher v. Westlake Nursing Home Ltd. P'ship, 871 F.3d at 1162. "First, the court must decide whether the scope of the federal rule is sufficiently broad to control the issue before the court, thereby leaving no room for the operation of seemingly conflicting state law." Racher v. Westlake Nursing Home Ltd. P'ship, 871 F.3d at 1162 (citations and quotations omitted). There is a conflict between federal and state law

---

[41]Erie R. Co. v. Tompkins, 304 U.S. 64 (1983).

if there is a "direct collision" that is "unavoidable," but there is no collision if the state and federal rules "can exist side by side . . . each controlling its own sphere of coverage." Racher v. Westlake Nursing Home Ltd. P'ship, 871 F.3d at 1163 (citations omitted). If there is no direct collision, "there is no need to consider whether the federal rule is valid, and instead, the analysis must proceed under Erie." Racher v. Westlake Nursing Home Ltd. P'ship, 871 F.3d at 1163. If there is a direct collision, a court must follow the federal rule if it is a valid exercise of the Supreme Court's rulemaking authority under the Rules Enabling Act, 28 U.S.C. § 2072, that is, it must "not abridge, enlarge or modify a substantive right." 28 U.S.C. § 2072(b). See Racher v. Westlake Nursing Home Ltd. P'ship, 871 F.3d at 1163-64.

> Justice Stevens, in his controlling concurrence in Shady Grove, addressed how, in a diversity case where state substantive law applies, to analyze whether a federal rule of procedure abridges, enlarges or modifies a substantive right. [Shady Grove, 559 U.S. at 418-21 (Stevens, J., concurring) ]; see Gasperini [v. Center for Humanities, Inc.], 518 U.S. [415] at 427 (1996)]. Justice Stevens advised courts not to rely on "whether the state law at issue takes the form of what is traditionally described as substantive or procedural." Shady Grove, 559 U.S. at 419 (Stevens, J., concurring). Rather, a more nuanced approach is required. [Shady Grove, 559 U.S. at 419-20]. Justice Stevens observed that "[a] state procedural rule, though undeniably 'procedural' in the ordinary sense of the term, may exist to influence substantive outcomes, and may in some instances become so bound up with the state-created right or remedy that it defines the scope of that substantive right or remedy." [Shady Grove, 559 U.S. at 419-20](citation and internal quotation marks omitted). One example of such a law is a procedural rule that "may . . . define the amount of recovery." [Shady Grove, 559 U.S. at 420]. Ultimately, a court must consider whether the federal procedural rule has displaced "a State's definition of its own rights or remedies." [Shady Grove, 559 U.S. at 418,]. If so, the federal rule may be invalid under the Rules Enabling Act because the federal rule abridges, enlarges or modifies a state substantive right.

Racher v. Westlake Nursing Home Ltd. P'ship, 871 F.3d at 1164 (citations omitted)(alteration in the original)(quoting Shady Grove, 559 U.S. at 418-20 (Stevens, J., concurring)). "[W]hen state law creates a cause of action, it also defines the scope of that cause of action," which includes "the applicable burdens, defenses, and limitations." Racher v. Westlake

Nursing Home Ltd. P'ship, 871 F.3d at 1164-65.  Consequently, even though burdens of proof, affirmative defenses, and liability limitations are all legal concepts that savor of procedure, "[f]ailing to enforce such attendant attributes of a state law would lead to different measures of the substantive rights enforced in state and federal courts," i.e., would modify substantive rights. Racher v. Westlake Nursing Home Ltd. P'ship, 871 F.3d at 1165.  See Walker v. Spina, 359 F. Supp. 3d 1054, 1082-83 (D.N.M. 2019)(Browning, J.).

## LAW REGARDING DIVERSITY JURISDICTION AND ERIE

Under Erie Railroad Co. v. Tompkins, 304 U.S. 64 (1983)("Erie"), a federal district court sitting in diversity applies "state law with the objective of obtaining the result that would be reached in state court." Butt v. Bank of Am., N.A., 477 F.3d 1171, 1179 (10th Cir. 2007).  Accord Mem. Hosp. v. Healthcare Realty Tr. Inc., 509 F.3d 1225, 1229 (10th Cir. 2007).  The Court has held that if a district court exercising diversity jurisdiction cannot find a Supreme Court of New Mexico "opinion that [governs] a particular area of substantive law . . . [the district court] must . . . predict how the Supreme Court of New Mexico would [rule]." Guidance Endodontics, LLC v. Dentsply Int'l., Inc., 708 F. Supp. 2d 1209, 1224-25 (D.N.M. 2010)(Browning, J.).  "Just as a court engaging in statutory interpretation must always begin with the statute's text, a court formulating an Erie prediction should look first to the words of the state supreme court." Peña v. Greffet, 110 F. Supp. 3d 1103, 1132 (D.N.M. 2015)(Browning, J.).[42]  If the Court finds only an

---

[42]In performing its Erie-mandated duty to predict what a state supreme court would do if faced with a case, see Comm'r v. Estate of Bosch, 387 U.S. 456 (1987), a federal court may sometimes contradict the state supreme court's own precedent if the federal court concludes that the state supreme court would, given the opportunity, overrule its earlier holding, see Anderson Living Trust v. WPX Energy Prod., LLC, 27 F. Supp. 3d 1188, 1247 n.30 (D.N.M. 2014)(Browning, J.).  Courts should, obviously, be reticent to formulate an Erie prediction that conflicts with state-court precedent; even if the prediction turns out to be correct, such predictions produce disparate results between cases filed in state and federal courts, as the old state supreme court precedent usually binds state trial courts.  The factors to which a federal court should look

opinion from the Court of Appeals of New Mexico, while "certainly [the Court] may and will

consider the Court of Appeal[s'] decision in making its determination, the Court is not bound by

the Court of Appeal[s'] decision in the same way that it would be bound by a Supreme Court

decision." Mosley v. Titus, 762 F. Supp. 2d 1298, 1332 (D.N.M. 2010)(Browning, J.)(noting that

where the only opinion on point is "from the Court of Appeals, . . . the Court's task, as a federal

district court sitting in this district, is to predict what the Supreme Court of New Mexico would do

if the case were presented to it")(citing Wade v. EMCASCO Ins., 483 F.3d 657, 666 (10th Cir.

2007)(explaining that, "[w]here no controlling state decision exists, the federal court must attempt

to predict what the state's highest court would do," and that, "[i]n doing so, it may seek guidance

from decisions rendered by lower courts in the relevant state"))).[43]   The Court may also rely on

---

before making an Erie prediction that a state supreme court will overrule its prior precedent vary
depending upon the case, but some consistent ones include: (i) the age of the state supreme court
decision from which the federal court is considering departing -- the younger the state case is, the
less likely it is that departure is warranted; (ii) the amount of doctrinal reliance that the state courts
-- especially the state supreme court -- have placed on the state decision from which the federal
court is considering departing; (iii) apparent shifts away from the doctrine that the state decision
articulates, especially if the state supreme court has explicitly called an older case's holding into
question; (iv) changes in the composition of the state supreme court, especially if mostly dissenting
justices from the earlier state decision remain on the court; and (v) the decision's patent illogic or
its inapplicability to modern times.  See Peña v. Greffet, 110 F. Supp. 3d at 1132 n.17.  In short, a
state supreme court case that a federal court Erie predicts will be overruled is likely to be very old,
neglected by subsequent state-court cases -- perhaps because it is in a dusty corner of the common
law which does not get much attention or have much application -- and clearly wrong.

[43]The Supreme Court has addressed what the federal courts may use when there is not a
decision on point from the state's highest court:

> The highest state court is the final authority on state law, but it is still the duty of
> the federal courts, where the state law supplies the rule of decision, to ascertain and
> apply that law even though it has not been expounded by the highest court of the
> State.  An intermediate state court in declaring and applying the state law is acting
> as an organ of the State and its determination, in the absence of more convincing
> evidence of what the state law is, should be followed by a federal court in deciding
> a state question.  We have declared that principle in *West v. American Telephone
> and Telegraph Co.*, 311 U.S. 223 (1940), decided this day.  It is true that in that

Tenth Circuit decisions interpreting New Mexico law.  See Anderson Living Trust v. WPX Energy

Prod., LLC, 27 F. Supp. 3d at 1243 & n.30.[44]  Ultimately, "the Court's task is to predict what the

---

> case an intermediate appellate court of the State had determined the immediate question as between the same parties in a prior suit, and the highest state court had refused to review the lower court's decision, but we set forth the broader principle as applicable to the decision of an intermediate court, in the absence of a decision by the highest court, whether the question is one of statute or common law.
>
> . . . .
>
> We have held that the decision of the Supreme Court upon the construction of a state statute should be followed in the absence of an expression of a countervailing view by the State's highest court, and we think that the decisions of the Court of Chancery [the New Jersey trial court] are entitled to like respect as announcing the law of the State.
>
> . . . .
>
> The question has practical aspects of great importance in the proper administration of justice in the federal courts.  It is inadmissible that there should be one rule of state law for litigants in the state courts and another rule for litigants who bring the same question before the federal courts owing to the circumstance of diversity of citizenship.  In the absence of any contrary showing, the rule [set forth by two New Jersey trial courts, but no appellate courts] appears to be the one which would be applied in litigation in the state court, and whether believed to be sound or unsound, it should have been followed by the Circuit Court of Appeals.

Fid. Union Tr. Co. v. Field, 311 U.S. 169, 177-80 (1940)(footnotes and citations omitted).  The Supreme Court has softened this position over the years; federal courts are no longer bound by state trial or intermediate court opinions, but "should attribute [them] some weight . . . where the highest court of the State has not spoken on the point."  Comm'r v. Estate of Bosch, 387 U.S. at 465 (citing King v. Order of United Commercial Travelers, 333 U.S. 153, 159 (1948)).  See 17A James Wm. Moore et al., Moore's Federal Practice § 124.20 (2021)("[T]hus federal courts should follow decisions of intermediate state appellate courts unless persuasive data indicate that the highest state court would decide the issue differently.").

[44]In determining the proper weight to accord Tenth Circuit precedent interpreting New Mexico law, the Court must balance the need for uniformity between federal court and state court interpretations of state law with the need for uniformity among federal judges.  If the Court adheres too rigidly to Tenth Circuit case law, ignoring changes undergone by a state's law in the ensuing years, then parties litigating state-law claims will be subject to a different body of substantive law, depending on whether they litigate in state court or federal court.  This result frustrates the purpose of Erie, which held that federal courts must apply state court interpretations of state law, rather than their own, in part so that parties achieve a consistent result regardless of the forum.  This consideration pulls the Court toward according Tenth Circuit precedent less weight and according state court decisions issued in the ensuing years more weight.  On the other hand, when the state law is unclear, it is desirable for there to at least be uniformity among federal judges as to its proper

interpretation.  Otherwise, different federal judges within the same circuit -- or even the same district, as district courts' decisions are not binding, even upon themselves -- would be free to adopt differing interpretations of a state's law.  This consideration pulls the Court towards a stronger respect for vertical stare decisis, because a Tenth Circuit decision on point -- regardless whether it accurately reflects state law --at least provides consistency at the federal level, so long federal district judges are required to follow it.

The Court must decide how to weigh Tenth Circuit case law against more-recent state court decisions, choosing a point on the spectrum between the two extremes: rigidly adhering to Tenth Circuit precedent unless there is intervening case law directly on point from the state's highest court, on one end; and independently interpreting the state law, regarding the Tenth Circuit precedent as no more than persuasive authority, on the other.  In striking this balance, the Court notes that it is generally more concerned about systemic inconsistency between the federal courts and the state courts than it is about inconsistency among federal judges.  Judges, even those within a jurisdiction with ostensibly identical governing law, sometimes interpret and apply the law differently from one another; this inconsistency is part and parcel of a common-law judicial system.  More importantly, litigants seeking to use forum selection to gain a substantive legal advantage cannot easily manipulate such inconsistency: cases are assigned randomly to district judges in this and many federal districts; and, regardless, litigants cannot know for certain how a given judge will interpret the state law, even if they could determine the identity of the judge pre-filing or pre-removal.  All litigants know in advance is that whomever federal district judge they are assigned will look to the entirety of the state's common law in making his or her determination -- the same as a state judge would.  Systemic inconsistency between the federal courts and state courts, on the other hand, not only threatens the principles of federalism, but litigants may more easily manipulate the inconsistency.  When the Tenth Circuit issues an opinion interpreting state law, and the state courts subsequently shift away from that interpretation, litigants -- if the district courts strictly adhere to the Tenth Circuit opinion -- have a definite substantive advantage in choosing the federal forum over the state forum, or vice versa.

The Court further notes that district courts may be in a better position than the Tenth Circuit to be responsive to changes in state law.  Tenth Circuit decisions interpreting a particular state's law on a specific issue are further apart in time than the collective district courts are.  More importantly, the Tenth Circuit does not typically address such issues with the frequency that the state's courts themselves do.  As such, Tenth Circuit precedent can lag behind developments in state law -- developments that the district courts may be nimble enough to perceive and adopt.  Additionally, much of the benefit of having a consistent Tenth Circuit-wide interpretation of a particular state's law is wasted.  Other than Oklahoma, every state encompassed by the Tenth Circuit contains only one federal judicial district, and there is relatively little need for federal judges in Wyoming and Kansas to have a uniform body of New Mexico law to which to look.  Last, the Court notes, respectfully, that district courts may be in a better position than the Tenth Circuit to develop expertise on the state law of the state in which they sit.  Every federal judicial district in the nation, except the District of Wyoming, covers at most one state.  It is perhaps a more workable design for each district court to keep track of legal developments in the state law of its own state(s) than it is for the Tenth Circuit to monitor separate legal developments in eight states.

Having outlined the relevant considerations, the Court thinks the proper stance on vertical stare decisis in the context of federal court interpretations of state law is as follows: the Tenth

Circuit's cases are binding as to their precise holding -- what the state law was on the day the opinion was published -- but lack the positive precedential force that its cases interpreting a federal statute or the federal Constitution possess. A district court considering a state law issue after the publication of a Tenth Circuit opinion on point may not come to a contrary conclusion based only on state court cases that were available to the Tenth Circuit and that the Tenth Circuit considered, but it may come to such a conclusion based on intervening state court cases.

When interpreting state law, the Tenth Circuit does not and cannot issue a case holding that *x* is the law in New Mexico; it holds that the proper interpretation of New Mexico law, at the time the opinion is released, is *x*. Its holdings are descriptive, not prescriptive -- interpretive, not normative. Because federal judicial opinions lack independent substantive force on state law issues, but possess such force regarding federal law issues, the Court thinks the following is not an unfair summary of the judicial interpretive process: (i) when interpreting federal law, the federal appellate courts consider the existing body of law, and then issue a holding that both reflects and influences the body of law; that holding subsequently becomes a part of the body of law; but (ii) when interpreting state law, the federal appellate courts consider the existing body of law, and then issue a holding that only reflects the body of law; that holding does not subsequently become a part of the body of law. The federal district courts are bound to conclude that the Tenth Circuit's reflection of the then-existing body of law was accurate. The question is whether they should build a doctrine atop the case and use the existence of the Tenth Circuit's case to avoid any responsibility to independently consider the whole body of state law that exists when the time comes that diversity litigants raise the issue in their courtrooms. Giving such effect to the Tenth Circuit's interpretations of state law is at tension with Erie, giving independent substantive effect to federal judicial decisions -- i.e., applying federal law -- in a case brought in diversity.

The purpose of Erie is well-known and simple, and the Court should not complicate it beyond recognition: it is that the same substantive law governs litigants' cases regardless whether they are brought in a federal or state forum. For simplicity's sake, most courts have settled on the formulation that "the federal court must attempt to predict how the states' highest court would rule if confronted with the issue." Moore's Federal Practice § 124.22[3] (citing Comm'r v. Estate of Bosch, 387 U.S. at 465 ("[A]n intermediate appellate state court [decision] is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." (citation and internal quotation marks omitted))). This formulation may not be the most precise one if the goal is to ensure identical outcomes in state and federal court -- the Honorable Milton I. Shadur, United States District Judge, looks to state procedural rules to determine in which state appellate circuit the suit would have been filed were it not in federal court, and then applies the state law as that circuit court interprets it, see Abbott Labs. v. Granite State Ins., 573 F. Supp. 193, 196-200 (N.D. Ill. 1983)(Shadur, J.)(noting that the approach of predicting the state supreme court's holdings will often lead to litigants obtaining a different result in federal court than they would in state court, where only the law of the circuit in which they filed -- and certainly not nonexistent, speculative state supreme court law -- governs) -- but it is a workable solution that has achieved consensus. See Allstate Ins. v. Menards, Inc., 285 F.3d 630, 637 (7th Cir. 2002)("[W]e adhere today to the general rule, articulated and applied throughout the United States, that, in determining the content of state law, the federal courts must assume the perspective of the highest court in that state and attempt to ascertain the governing substantive law on the point in question."). This formulation, built out of ease-of-use, does not relieve courts of their Supreme Court-mandated obligation to

consider state appellate and trial court decisions.  To the contrary, even non-judicial writings by influential authors, statements by state supreme court justices, the closeness of the vote on a prior case addressing the issue, and personnel changes on the court -- considerations that would never inform a federal court's analysis of federal law -- may validly come into play.  The question is whether the district courts must abdicate, across-the-board, the "would decide" aspect of the Erie analysis to their parent appellate courts when the Court of Appeals has declared an interpretation of state law.

The Erie doctrine results in federal cases that interpret state law withering with time.  While cases interpreting federal law become more powerful over time -- forming the groundwork for doctrines, growing upward from one application (Congress may create a national bank) to many (Congress may set quotas on wheat-growing for personal consumption), expanding outward from the general (states must grant criminal jury trials) to the specific (the jury need not be twelve people, nor must it be unanimous) -- federal cases interpreting state law often become stale.  New state court cases -- even when not directly rebuking the federal court's statement of law -- alter the common-law legal landscape with their dicta, their insinuations, and their tone.  The Supreme Court, which picks its cases sparingly and for maximum effect, almost never grants certiorari to resolve issues of state law.

The Court's views on Erie, of course, mean little if the Tenth Circuit does not agree.  In Wankier v. Crown Equipment Corp., the Tenth Circuit said that,

> [w]here no controlling state decision exists, the federal court must attempt to predict what the state's highest court would do.  In performing this ventriloquial function, however, the federal court is bound by ordinary principles of *stare decisis*.  Thus, when a panel of this Court has rendered a decision interpreting state law, that interpretation is binding on district courts in this circuit, and on subsequent panels of this Court, unless an intervening decision of the state's highest court has resolved the issue.

Wankier v. Crown Equip. Corp., 353 F.3d 862, 866 (10th Cir. 2003)(McConnell, J.).  From this passage, it seems clear that the Tenth Circuit permits a district court to deviate from its view of state law only on the basis of a subsequent case "of the state's highest court."  The American Heritage Dictionary of the English Language 1402 (William Morris ed., New College ed. 1976)(defining "unless" as "[e]xcept on the condition that; except under the circumstances that").  A more aggressive reading of the passage -- namely the requirement that the intervening case "resolv[e] the issue," Wankier v. Crown Equip. Corp., 353 F.3d at 866 -- might additionally compel the determination that any intervening case law must definitively and directly contradict the Tenth Circuit interpretation to be considered "intervening."

It is difficult to know whether Judge McConnell's limitation of "intervening decision" to cases from the highest state court was an oversight or intentional.  Most of the Tenth Circuit's previous formulations of this rule have defined intervening decisions inclusively as all subsequent decisions of "that state's courts," a term which seems to include trial and intermediate appellate courts.  Even Koch v. Koch Industries, Inc., 203 F.3d 1202, 1231 (10th Cir. 2000), the primary authority upon which Wankier v. Crown Equipment Corp. relies, uses the more inclusive definition.  In fact, Wankier v. Crown Equipment Corp. quotes its relevant passage:

state supreme court would do." Wade v. EMCASCO Ins. Co., 483 F.3d at 666.  Accord Mosley

v. Titus, 762 F. Supp. 2d at 1332 (citation omitted); Rimbert v. Eli Lilly & Co., 577 F. Supp. 2d

1174, 1188-89 (D.N.M. 2008)(Browning, J.).

### LAW REGARDING TITLE VII EMPLOYMENT DISCRIMINATION CASES

"Title VII of the Civil Rights Act of 1964 forbids employment discrimination based on

race, color, religion, sex, or national origin."  Brown v. Gen. Servs. Admin., 425 U.S. 820, 825

(1976)(citing 42 U.S.C. §§ 2000e-2, 2000e-3).  The Court has noted that Title VII generally

protects individuals from employers' improperly motivated adverse treatment in the workplace:

"Title VII of the Civil Rights Act of 1964 prohibits an employer from failing or refusing to hire or

discharging any individual, or otherwise discriminating against any individual with respect to his

---

> In the absence of intervening Utah authority indicating that a plaintiff is not
> required to prove a safer, feasible alternative design, we are bound to follow the
> rule of Allen [v. Minnstar, Inc.], 8 F.3d 1470 (10th Cir. 1993), a Tenth Circuit case
> interpreting an issue of Utah law], as was the district court. "Following the doctrine
> of stare decisis, one panel of this court must follow a prior panel's interpretation of
> state law, absent a supervening declaration to the contrary by that state's courts or
> an intervening change in the state's law."  Koch v. Koch Indus., Inc., 203 F.3d at
> 1231.

Wankier v. Crown Equip. Corp., 353 F.3d at 867.

Whether the decision to limit the intervening authority a district court can consider was
intentional or not, the Tenth Circuit has picked it up and run with it.  In Kokins v. Teleflex, Inc.,
the Tenth Circuit, quoting Wankier v. Crown Equipment Corp., refused to consider an opinion
from the Court of Appeals of Colorado holding directly the opposite of an earlier Tenth Circuit
interpretation of Colorado law.  See Kokins v. Teleflex, Inc., 621 F.3d 1290, 1297 (10th Cir.
2010)(Holmes, J.)("[T]he Colorado Court of Appeals decided Biosera[, Inc. v. Forma Scientific,
Inc., 941 P.2d 284 (Colo. Ct. App. 1998)], so it is not an 'intervening decision of the state's *highest
court*.'"  (emphasis in original)(quoting Wankier v. Crown Equip. Corp., 353 F.3d at 866)).

The Tenth Circuit has set forth a stringent restriction on its district courts' ability to
independently administer the Erie doctrine.  More importantly, the Tenth Circuit's view may be at
tension with the above-quoted Supreme Court precedent, as well as its own prior case law.
Moore's lists the Tenth Circuit as having been, at one time, a "court[ that] hold[s] that a prior
federal appellate decision [interpreting state law] is persuasive."  Moore's § 124.22[4] (citing State
Farm Mut. Auto. Ins. v. Travelers Indem. Co., 433 F.2d 311, 312 (10th Cir. 1970)).  Still, the Court
is bound to abide by the Tenth Circuit's interpretation of Erie.

compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." Farley v. Leavitt, No. CIV 05-1219 JB/LFC, 2007 WL 6364329, at *6 (D.N.M. Dec. 31, 2007)(Browning, J.)(internal quotation marks and alterations omitted)(quoting 42 U.S.C. § 2000e-2(a)(1)). With the 1972 amendments to the statute, Title VII's protections apply to federal and private employees. See Brown v. Gen. Servs. Admin., 425 U.S. at 825-26 (citing 42 U.S.C. § 2000e(b)); Walton v. N.M. State Land Office, 113 F. Supp. 3d 1178, 1184 (D.N.M. 2015)(Browning, J.); Gerald v. Locksley, 785 F. Supp. 2d 1074, 1098 (D.N.M. 2011)(Browning, J.).

### 1.    Title VII Retaliation.

To establish a prima facie case of retaliation, a plaintiff must show: "(1) that he engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action." Proctor v. United Parcel Serv., 502 F.3d 1200, 1208 (10th Cir. 2007)(internal quotation marks omitted)(quoting Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d at 1202). "To establish that a causal connection exists," a plaintiff "may proffer 'evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action.'" Proctor v. United Parcel Serv., 502 F.3d at 1208 (quoting Haynes v. Level 3 Commc'ns, LLC, 456 F.3d 1215, 1228 (10th Cir. 2006)). Generally speaking, if this temporal proximity between the protected activity and the adverse action are not "very close in time," the plaintiff "must offer additional evidence to establish causation." Proctor v. United Parcel Serv., 502 F.3d at 1209 (internal quotation marks omitted)(quoting Haynes v. Level 3 Commc'ns, LLC, 456 F.3d at 1228). See Walton v. N.M. State Land Office, 113 F. Supp. 3d at 1190; Gerald v. Locksley, 785 F. Supp. 2d at 1099-1100.

2.      **Materially Adverse Employment Action**.

The Tenth Circuit liberally defines what constitutes an adverse employment action.  <u>See</u>

<u>Orr v. City of Albuquerque</u>, 417 F.3d 1144, 1150 (10th Cir. 2005)("Because of the remedial nature

of Title VII lawsuits, we broadly define adverse employment action.").   The Tenth Circuit has

stated:

> Such actions are not simply limited to monetary losses in the form of wages or
> benefits.  *See Berry v. Stevinson Chevrolet*, 74 F.3d 980, 986-87 (10th Cir. 1996).
> Instead, we take a "case-by-case approach," examining the unique factors relevant
> to the situation at hand.  *Jeffries* [<u>v. Kansas</u>, 147 F.3d 1220, ]1232 [(10th Cir.
> 1998)].  Nevertheless, we will not consider "a mere inconvenience or an alteration
> of job responsibilities" to be an adverse employment action. *Crady v. Liberty Nat'l
> Bank & Trust Co.*, 993 F.2d 132, 136 (7th Cir. 1993) . . . .

<u>Sanchez v. Denver Pub. Sch.</u>, 164 F.3d 527, 532 (10th Cir. 1998).  <u>See</u> <u>Proctor v. United Parcel</u>

<u>Serv.</u>, 502 F.3d at 1208.  An adverse action "is not limited to discriminatory actions that affect the

terms and conditions of employment."  <u>Burlington N. & Santa Fe Ry. v. White</u>, 548 U.S. 53, 64

(2006).  "[A] plaintiff must show that a reasonable employee would have found the challenged

action materially adverse, which in this context means it well might have dissuaded a reasonable

worker from making or supporting a charge of discrimination."  <u>Reinhardt v. Albuquerque Pub.</u>

<u>Sch. Bd. of Educ.</u>, 595 F.3d 1126, 1133 (10th Cir. 2010)(internal quotation marks omitted)(quoting

<u>Burlington N. & Santa Fe Ry. v. White</u>, 548 U.S. at 68).  "The antiretaliation provision protects

an individual not from all retaliation, but from retaliation that produces an injury or harm."

<u>Burlington N. & Santa Fe Ry. v. White</u>, 548 U.S. at 67-68 ("We speak of *material* adversity

because we believe it is important to separate significant from trivial harms.").  "We construe the

phrase 'adverse employment action' liberally and do not limit it to 'monetary losses in the form of

wages or benefits.'"  <u>Reinhardt v. Albuquerque Pub. Sch. Bd. of Educ.</u>, 595 F.3d at 1133 (quoting

<u>Annett v. Univ. of Kan.</u>, 371 F.3d 1233, 1239 (10th Cir. 2004)).  Acts that carry "a significant risk

of humiliation, damage to reputation, and a concomitant harm to future employment prospects"
may be considered adverse actions, Berry v. Stevinson Chevrolet, 74 F.3d at 986, although "'a
mere inconvenience or an alteration of job responsibilities' will not suffice," Annett v. Univ. of
Kan., 371 F.3d at 1239 (quoting Sanchez v. Denver Pub. Sch., 164 F.3d at 532).

   In Anderson v. Clovis Municipal Schools, 265 F. App'x 699 (10th Cir. 2008)(unpublished),
the Tenth Circuit, in an unpublished opinion, addressed the requirement of an adverse employment
action in the context of a disparate-treatment claim and a hostile work environment claim.  There,
an employee, who had been placed on a growth plan, alleged other harsh treatment and a written
reprimand in support of his claim that he suffered a hostile work environment.  See 265 F. App'x
at 704.  Relying on Schuler v. City of Boulder, 189 F.3d 1304 (10th Cir. 1999), the plaintiff argued
that the growth plan and formal reprimand rose to the level of an adverse employment action under
Tenth Circuit law.  See 265 F. App'x at 704.  In MacKenzie v. City & County of Domier, the
Tenth Circuit discussed Anderson v. Clovis Municipal School's reliance on Schuler v. City of
Boulder and stated: "While adverse employment actions extend beyond readily quantifiable losses,
not everything that makes an employee unhappy is an actionable adverse action.  Otherwise, minor
and even trivial employment actions . . . would form the basis of a discrimination suit."  414 F.3d
at 1279 (internal quotation marks omitted)(quoting Smart v. Ball State Univ., 89 F.3d 437, 441
(7th Cir. 1996)).   See Heno v. Sprint/United Mgmt. Co., 208 F.3d 847, 857 (10th Cir.
2007)(explaining that Title VII proscribes only discriminatory conduct that "alters the employee's
'compensation, terms, conditions, or privileges of employment,' or 'adversely affect[s] [the
employee's] status as an employee" (second alteration added)(quoting Sanchez v. Denver Pub.
Sch., 164 F.3d at 533)).  "Only acts that constitute a significant change in employment status, such
as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a

decision causing a significant change in benefits will rise to the level of an adverse employment action."   Robinson v. Cavalry Portfolio Servs., LLC, 365 F. App'x 104, 114 (10th Cir. 2010)(unpublished)(internal quotation marks omitted)(quoting Haynes v. Level 3 Commc'ns, 456 F.3d at 1222).   See Walton v. N.M. State Land Office, 113 F. Supp. 3d at 1190-92; Gerald v. Locksley, 785 F. Supp. 2d at 1100-01.

## ANALYSIS

APS argues that there is no genuine dispute of material fact that it did not discriminate against Martin on the basis of his age, did not retaliate against Martin for reporting safety concerns, and did not fire Martin out of retaliation.   See MSJ Memo at 15-16.   According to APS, the "undisputed evidence is that APS terminated Plaintiff Thomas Martin because of repeated safety policy violations," and Martin "presents no evidence that his age or alleged complaints about safety issues or perceived discrimination contributed in any way to his termination."   Reply at 1.   Finally, APS argues that Martin is not entitled to back pay or front pay, because he did not mitigate his damages.   See MSJ Memo at 27-28.   APS is entitled to summary judgment on all three of Martin's claims if it shows that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a).   See Celotex, 477 U.S. at 323.

As a threshold matter, rule 56 of the Federal Rules of Civil Procedure applies, and not the summary judgment standard that New Mexico uses.   Martin asserts that the Court should not grant summary judgment here, because "'New Mexico courts, unlike federal courts, view summary judgment with disfavor, preferring a trial on the merits.'"   Response at 9 (quoting Romero v. Phillips, 2010-NMSC-035, ¶ 8, 148 N.M. 713, 820, 242 P.3d 280, 287).   Martin does not cite to rule 56 or to any federal caselaw.   Because the Court has diversity jurisdiction pursuant to 18 U.S.C. § 1332, the Court must apply state substantive law and federal procedural law.   See

Gasperini v. Ctr. For Humanities, Inc., 518 U.S. 415, 427 (1996)("Under the Erie doctrine, federal courts sitting in diversity apply state substantive law and federal procedural law.").  The summary-judgment standard is procedural, so the federal standard applies.  See Foster v. Alliedsignal, Inc., 293 F.3d 1187, 1194-95 (10th Cir. 2002)(explaining that a "federal court sitting in diversity will be guided by federal-law standards governing summary judgment procedure").  See also General Acc. Fire and Life Assur. Corp., Ltd. v. Akzona, Inc., 622 F.2d 90, 93 n.5 (4th Cir. 1980).  Applying the federal summary judgment standard, the Court concludes that: (i) APS did not discriminate against Martin on the basis of age; (ii) APS did not retaliate against Martin for making an age-discrimination complaint; (iii) APS did not retaliate against Martin for reporting safety concerns; and (iv) Martin is not entitled to back pay or front pay, because he did not reasonably mitigate his damages.

## I.    APS DID NOT DISCRIMINATE AGAINST MARTIN ON THE BASIS OF HIS AGE.

First, APS argues that there is no genuine factual dispute that APS did not discriminate against Martin in violation of the NMHRA.  See MSJ Memo at 16-22.  The NMHRA prohibits employers from firing someone "because of . . . age," unless it is "based on a bona fide occupational qualification or other statutory prohibition."   N.M.S.A. § 28-1-7(A).  A plaintiff's burden under the NMHRA is "identical" to his or her burden under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e.  Orr v. City of Albuquerque, 417 F.3d at 1149 n.5 (citing Cates v. Regents of New Mexico Inst. Of Mining & Tech., 1998-NMSC-002, ¶¶ 15-16, 124 N.M. at 638, 954 P.2d at 70).  When assessing NMHRA discrimination claims, New Mexico courts, therefore, apply a burden-shifting framework consistent with the framework in McDonnell-Douglas Corp. v. Green, 411 U.S. at 802-05.  See Smith v. FDC Corp., 1990-NMSC-020, ¶ 10, 109 N.M. 514, 518, 787 P.2d 433, 437.  A plaintiff may, however, bypass the McDonnell-Douglas Corp. v. Green, 411

U.S. at 802-05, burden-shifting framework by showing intentional discrimination.  See Smith v. FDC Corp., 1990-NMSC-020, ¶ 11, 109 N.M. at 518, 787 P.2d at 437.

Martin does not present evidence that APS intentionally discriminated against him.  See Response at 9-11.  To demonstrate that APS violated the NMHRA by discriminating based on his age, therefore, Martin must first show a prima facie case of discrimination, which he can do by showing that: (i) he is a member of the protected group; (ii) he was qualified to continue in his position; (iii) APS terminated his employment; and (iv) either (a) APS filled his position with someone not a member of the protected class, (b) APS fired Martin purportedly for conduct nearly identical to that engaged in by someone younger than forty-years old, or (c) the "surrounding circumstances" indicate that Martin suffered age discrimination.  Cates v. Regents of New Mexico Inst. Of Mining & Tech., 1998-NMSC-002, ¶ 19, 124 N.M. at 639, 954 P.2d at 71 (1998).  See Garcia v. Hatch Valley Public Schools, 2018-NMSC-020, ¶¶ 28-29, 458 P.3d 378, 386-87; Smith v. FDC Corp., 1990-NMSC-020, ¶ 10, 109 N.M. at 518, 787 P.2d at 437.  If Martin makes a prima facie case of discrimination, then the burden shifts to APS to "demonstrate a legitimate non-discriminatory reason for the adverse employment action."  Orr v. City of Albuquerque, 417 F.3d 1144, 1149 n.5 (10th Cir. 2005).  See Smith v. FDC Corp., 1990-NMSC-020, ¶ 111, 109 N.M. at 518, 787 P.2d at 437.  If APS demonstrates a legitimate, non-discriminatory reason for firing Martin, then the burden shifts back to Martin to prove that APS' reasons were "merely a pretext for discrimination."  Jaramillo v. Colo. Jud. Dep't, 427 F.3d 1303, 1307 (10th Cir. 2005).

There is no genuine factual dispute that APS did not discriminate against Martin based on Martin's age.  First, because Martin was in his late fifties when APS fired him, he is a member of a protected class.  See Response at 9.  See Cates v. Regents of New Mexico Inst. Of Mining & Tech., 1998-NMSC-002, ¶¶ 18, 124 N.M. at 638, 954 P.2d at 70 (1998)(concluding that "40 years

old marks the minimum age in the protected age class cases of employment discrimination under the" NMHRA).   Second, there is no dispute that Martin was qualified to continue in his APS position.   Martin began to work at APS in 2007, <u>see</u> MSJ Memo ¶ 5, at 2; Response at 1, and neither APS nor Martin points to any evidence suggesting that the job qualifications changed or that Martin became less qualified.   Third, the parties agree that APS fired Martin on September 20, 2018, and that APS terminated Martin for violating a clearly established company policy.   <u>See</u> MSJ Memo ¶ 53, at 9; 2018 EAD at 152.   Fourth, APS filled Martin's position with Yazzie, who was 58 years old and had worked for APS for approximately forty years.   <u>See</u> MSJ Memo ¶ 83, at 14; Susag Depo. at 19:8-17; Goodman Decl. ¶ 14, at 87; Response at 7.   Moreover, there is no evidence that APS purportedly fired Martin for conduct that is very similar to what other, younger employees had done.   Neither Martin nor APS points to any evidence that other, younger APS employees violated APS policies.

Finally, Martin asserts that he makes a prima facie age discrimination case, because he shows that age was one "motivating factor" for his termination.   Response at 11.   Because Yazzie, Martin's replacement, is close in age to Martin, Martin can only satisfy the fourth element of the prima-facie age discrimination test by showing that the "surrounding circumstances" indicate that Martin suffered age discrimination.   <u>Cates v. Regents of New Mexico Inst. Of Mining & Tech.</u>, 1998-NMSC-002, ¶ 19, 124 N.M. at 639, 954 P.2d at 71.   Contrary to Martin's contention, the undisputed facts do not show that the surrounding circumstances indicate that Martin suffered age discrimination.   Martin argues that he suffered age discrimination, because he reported other APS employees for safety violations.   <u>See</u> Response at 9.   The undisputed facts show, however, that APS' decision to fire Martin did not involve age considerations, any safety concerns that Martin raised, or any complaints of age discrimination that he had raised.   <u>See</u> MSJ Memo ¶ 51, at 9;

Micatrotto Decl. ¶ 23, at 6.  Martin points to no evidence tending to show that APS treated him differently because of his age.  There is, therefore, no genuine issue of material fact that APS did not discriminate against Martin based on Martin's age.  See Fed. R. Civ. P. 56(a); Osborne v. Baxter Healthcare Corp., 798 F.3d 1260, 1266 (10th Cir. 2015)(noting that summary judgment is appropriate when the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law).

## II.    APS DID NOT RETALIATE AGAINST MARTIN FOR MAKING AN AGE-DISCRIMINATION COMPLAINT.

Second, APS argues that there is no genuine dispute that APS did not retaliate against Martin in violation of NMHRA.  See MSJ Memo at 22-25.  The NMHRA prohibits employers from engaging in "any form of threats, reprisal or discrimination against any person who has opposed any unlawful discriminatory practice or has filed a complaint, testified or participated in any proceeding under the" NMHRA.  N.M.S.A. § 28-1-7(I).  New Mexico courts apply the McDonnell-Douglas Corp. v. Green, 411 U.S. at 802-05, burden-shifting framework to retaliation claims under the NMHRA.  See Juneau v. Intel Corp., 2006-NMSC-002, ¶ 9, 139 N.M. at 15, 127 P.3d at 551.  To establish a prima facie case of retaliation under the NMHRA, therefore, Martin must show that: (i) he engaged in protected activity; (ii) he was subject to adverse employment action subsequent to or contemporaneous with the protected activity; and (iii) a causal connection exists between the protected activity and the adverse employment action.  See Juneau v. Intel Corp., 2006-NMSC-002, ¶ 11, 139 N.M. at 15, 127 P.3d at 551 (citing Gonzales v. N.M. Dep't of Health, 2000-NMSC-029, ¶ 22, 129 N.M. at 594, 11 P.3d at 558).  If Martin establishes a prima facie retaliation case, the burden shifts back to APS to "provide a legitimate, non-discriminatory reason for the adverse employment action."  Juneau v. Intel Corp., 2006-NMSC-002, ¶ 9, 139 N.M. at 15, 127 P.3d at 551.  Martin would then have the "opportunity to rebut APS's proffered

reasons as pretextual or otherwise inadequate." Juneau v. Intel Corp., 2006-NMSC-002, ¶ 9, 139

N.M. at 15, 127 P.3d at 551.

APS argues that Martin never engaged in any protected activity or opposition under the

NMHRA.  See MSJ Memo at 22-23.  Martin asserts that he engaged in two protected activities:

complaining of age discrimination on June 1, 2018, and raising safety concerns about the breaker

room in June, 2017.  See Reply at 11.  Protected activity under the NMHRA "can range from filing

formal charges to voicing informal complaints to superiors."  Hertz v. Luzenac America, Inc., 370

F.3d 1014, 1015 (10th Cir. 2004).  Martin's complaints about breaker-room safety are not

protected activity under NMHRA, because the NMHRA prohibits retaliation for opposing "any

unlawful discriminatory practice," or complaining, testifying, or participating in "any proceeding

under" the NMHRA.  N.M.S.A. § 28-1-7(I).  The NMHRA protects employees from

discrimination based on age, religion, color, national origin, ancestry, sex, physical or mental

handicap or serious medical condition."  N.M.S.A. § 28-1-7(A).  There is no indication that any

part of the NMHRA prohibits discriminating against people who make safety complaints.

Moreover, although the New Mexico courts have not elaborated on the scope of protected activity

for a retaliation claim, the Tenth Circuit notes that, in the Title VII context, a plaintiff must oppose

a practice that Title VII makes unlawful.  See Hansen v. SkyWest Airlines, 844 F.3d 914, 925-26

(10th Cir. 2016)("By its terms, Title VII prohibits retaliation against an employee who has

'opposed any practice made an unlawful employment practice' by Title VII" (quoting 42 U.S.C.

§ 2000e-3(a)); Held v. Ferrellgas, Inc., 505 F. App'x 687, 989 (10th Cir. 2012)(unpublished)("To

establish that he was engaged in a statutorily protected activity, [the plaintiff] must show that he

had a reasonable, good faith belief that he was opposing discrimination prohibited by Title VII.").

Because a plaintiff's burden under the NMHRA is "identical" to a plaintiff's burden under Title

VII, and because the courts' "analysis of the federal law applies equally to their state-law" claims, Martin's safety complaints are not protected activity under the NMHRA.   Orr v. City of Albuquerque, 417 F.3d at 1149 n.5.  See Juneau v. Intel Corp., 2006-NMSC-002, ¶ 42, 139 N.M. at 22, 127 P.3d at 558 (Minzner, J., concurring)(noting that the NMHRA "prohibits only certain types of discrimination; it does not prohibit all unfair or unreasonable employment actions"). Martin's age-discrimination complaint is protected activity, however.  On June 1, 2018, Martin complained to Clines about age discrimination on June 1, 2018.  See Response at 6 (asserting this fact); Martin Depo. at 168:3-12.  The NMHRA protects against age discrimination, and Martin's complaint is protected.  See Hertz v. Luzenac America, Inc., 370 F.3d at 1015.

Martin was subject to an adverse employment action.  "An adverse employment action occurs when an employer imposes a tangible, significant, harmful change in the conditions of employment."  Ulibarri v. State of N.M. Corr. Acad., 2006-NMSC-009, ¶ 16, 139 N.M. 193, 131 P.3d 43.  APS fired Martin on September 20, 2018.  See MSJ Memo ¶ 53, at 9; Goodman Decl. at 87; EAD 152.  There is no dispute, therefore, that Martin was subject to an adverse employment action.

Finally, APS contends that there is no causal connection between Martin's protected activity and his termination.  See MSJ Memo at 23.  Causation may be inferred "if the adverse employment action has occurred within a short time after the protected activity."  Juneau v. Intel Corp., 2006-NMSC-002, ¶ 20, 139 N.M. at 18, 127 P.3d at 554.  If no other evidence of causation is available, a plaintiff may "rely on an inference of causation arising from a short time period between the protected activity and the adverse employment action."  Juneau v. Intel Corp., 2006-NMSC-002, ¶ 20, 139 N.M. at 18, 127 P.3d at 554.  There is no causal relationship between the protected activity and the adverse action "if those taking the action were unaware of the existence

of the protected action." <u>Shinwari v. Raytheon Aircraft Co.</u>, 215 F.3d 1337 (Table), 2000 WL 731782, at *6 (10th Cir. 2000)(abrogated on other grounds by <u>Clark Cnty. Sch. Dist. v. Breeden</u>, 532 U.S. 268, 269 (2001), as recognized by <u>Crumpacker v. Kansas Dept. of Human Res.</u>, 338 F.3d 1163, 1171 (10th Cir. 2003)).   There is no dispute that there is no causal connection between Martin's age-discrimination complaints and APS' decision to terminate Martin.   APS' decision to fire Martin did not involve any considerations of Martin's age, any safety concerns that he raised, or any complaints about discrimination or retaliation he had made.   <u>See</u> MSJ Memo ¶ 51, at 9; Micatrotto Decl. ¶ 23, at 6; Response at 5.   There is, therefore, no genuine dispute of material fact that Martin does not make a prima facie NMHRA retaliation case.   APS, therefore, did not retaliate against Martin for making an age-discrimination complaint or for raising safety concerns.

## III.   APS DID NOT RETALIATE AGAINST MARTIN FOR REPORTING SAFETY CONCERNS.

Third, APS argues that there is no genuine dispute of material fact that APS did not retaliate against Martin for reporting safety concerns.   <u>See</u> MSJ Memo at 25.   New Mexico recognizes a common-law cause of action for retaliatory discharge.   <u>See</u> <u>Chavez v. Manville Prods. Corp.</u>, 1989-NMSC-050, ¶ 16, 108 N.M. at 647, 777 P.2d at 375.   For a plaintiff to recover for common-law retaliatory discharge, the plaintiff "'must demonstrate that he was discharged because he performed an act that public policy has authorized or would encourage, or because he refused to do something required of him by his employer that public policy would condemn.'"   <u>Shovelin v. Central New Mexico Elec. Co-op., Inc.</u>, 1992-NMSC-015, ¶ 24, 115 N.M. 293, 303, 850 P.2d 996, 1006 (quoting <u>Chavez v. Manville Prods. Corp.</u>, 1989-NMSC-050, ¶ 16, 108 N.M. 643, 647, 777 P.2d 371, 375).   The employee also must show by a preponderance of the evidence that there is a causal connection between the employee's actions and the employer's retaliatory discharge.   <u>See</u> <u>Shovelin v. Centr. New Mexico Elec. Co-op., Inc.</u>, 1992-NMSC-015, ¶ 24, 115 N.M. at 303, 850

P.2d at 1006.  If the employee meets this burden, the employee is entitled to recover damages for pecuniary loss and for emotional distress.  See Shovelin v. Central New Mexico Elec. Co-op., Inc., 1992-NMSC-015, ¶ 24, 115 N.M. at 303, 850 P.2d at 1006.  In New Mexico, retaliatory discharge is a "narrow exception to the rule of employment at will," and courts have "refused to expand its application."  Shovelin v. Centr. New Mexico Elec. Co-op., Inc., 1992-NMSC-015, ¶ 26, 115 N.M. at 304, 850 P.2d at 1007.  An action for retaliatory discharge is available only to at-will employees, and not to those with an employment contract.[45]  See Silva v. Am. Fed'n of State, Cnty. and Mun. Emps., 2001-NMSC-038, ¶ 21, 131 N.M. 364, 368, 37 P.3d 81, 85.

APS contends that Martin does not identify a public policy that he violated or that he refused to violate.  See MSJ Memo at 26.  Martin responds that both the breaker-room incident and the welding-cubicles incidents were potential violations of the New Mexico Occupational Health and Safety Act, N.M.S.A. § 50-9-25 ("NMOHSA") or Occupational Safety and Health Administration ("OSHA") regulations.  Reply at 12.  The "linchpin of a cause of action for retaliatory discharge is whether by discharging the complaining employee, the employer violated a 'clear mandate of public policy.'"  Shovelin v. Centr. New Mexico Elec. Co-op., Inc., 1992-NMSC-015, ¶ 25, 115 N.M. at 303, 850 P.2d at 1006 (quoting Vigil v. Arzola, 1983-NMCA-082, ¶ 7, 102 N.M. 682, 689, 699 P.2d 613, 619).  A plaintiff can show a "clear mandate of public policy" by pointing to one of four different public policy expressions: (i) legislation that defines public policy; (ii) legislation that protects an employee but does not provide a remedy, in which

---

[45]Here, the Court assumes that Martin was an at-will employee, because neither Martin nor APS notes whether Martin was an at-will employee or had an employment contract with APS.  In the absence of any evidence to the contrary, the Court assumes that the retaliatory discharge cause of action is available to Martin.  Moreover, there is no evidence that Martin's employment had a definite end date, which the Court takes to mean that his employment was at-will.  See Trujillo v. N. Rio Arriba Elec. Co-op, Inc., 2001-NMSC-004, ¶ 22, 131 N.M. 607, 615, 41 P.3d 333, 341.

case an employee can seek an implied remedy; (iii) legislation that defines public policy "without specifying either a right or a remedy, in which case the employee would seek judicial recognition of both"; and (iv) some limited instances in which there is "'no expression of public policy, and here again the judiciary would have to imply a right as well as a remedy.'"  Shovelin v. Centr. New Mexico Elec. Co-op., Inc., 1992-NMSC-015, ¶ 25, 115 N.M. at 303, 850 P.2d at 1006 (quoting Vigil v. Arzola, 1983-NMCA-082, ¶ 7, 102 N.M. at 689, 699 P.2d at 620).

As a threshold matter, although it is not clear under New Mexico law whether Martin has a cause of action, the Court will proceed as if he does.  New Mexico recognizes a retaliatory discharge cause of action for employees who are fired because they report safety concerns to the appropriate public agency.  See Gutierrez v. Sundancer Indian Jewelry, Inc., 1993-NMCA-156, ¶ 19, 117 N.M. 41, 47, 868 P.2d 1266, 1272.  The Court of Appeals of New Mexico states: "[W]e find that allowing an employer to retaliate against an employee for reporting unsafe working conditions to appropriate public officials is contrary to public policy in New Mexico and gives rise to a common-law remedy."  Gutierrez v. Sundancer Indian Jewelry, Inc., 1993-NMCA-156, ¶ 19, 117 N.M. at 47, 868 P.2d at 1272.[46]  New Mexico courts have not stated, however, whether this cause of action extends to an employee who reports a workplace safety concern only to their supervisor.  The Supreme Court of New Mexico notes that, in Gutierrez v. Sundancer Indian Jewelry, Inc., 1993-NMCA-156, ¶ 19, 117 N.M. at 47, 868 P.2d at 1272, it concluded that "reporting unsafe working conditions to appropriate the public agency . . . further the public

---

[46]The Court concludes that the Supreme Court of New Mexico would agree with the Court of Appeals of New Mexico's decision in Gutierrez v. Sundancer Indian Jewelry, Inc., 1993-NMCA-156, ¶ 19, 117 N.M. 41, 47, 868 P.2d 1266, 1272, because the Supreme Court of New Mexico agrees that retaliatory-discharge claims extend to those who report safety concerns to the appropriate public agency, Garrity v. Overland Sheepskin Co. of Taos, 1996-NMSC-032, at ¶ 23, 121 N.M. 710, 716, 917 P.2d 1382, 1388.

interest in a safe workplace and would serve the basis for a retaliatory-discharge suit." Garrity v. Overland Sheepskin Co. of Taos, 1996-NMSC-032, at ¶ 23, 121 N.M. 710, 716, 917 P.2d 1382, 1388.  The Supreme Court of New Mexico notes, however, that it has not decided whether a retaliatory-discharge suit is available to an employee who reports information "only to his or her supervisor," but only that its conclusion in Gutierrez v. Sundancer Indian Jewelry, Inc., 1993-NMCA-156, ¶ 19, 117 N.M. at 47, 868 P.2d at 1272, "should not be read as foreclosing the possibility of bringing a retaliatory-discharge claim in such circumstances," Garrity v. Overland Sheepskin Co. of Taos, 1996-NMSC-032, at ¶ 23, 121 N.M. at 716, 917 P.2d at 1388.  See Cordova v. PNM Elec. And Gas Servs., 72 F. App'x 789, 793 (10th Cir. 2003)(unpublished)(noting that it is not clear whether New Mexico recognizes "retaliation for an internal safety complaint as a cause of action").  Although the Supreme Court of New Mexico has not yet clarified whether an employee who does not report safety concerns to the appropriate public agency and only reports the concerns to the employee's supervisor has a retaliatory-discharge claim, because Supreme Court of New Mexico concludes that it is does not "foreclos[e]" the claim's existence, the Court will proceed as if Martin has a retaliatory-discharge claim.  Garrity v. Overland Sheepskin Co. of Taos, 1996-NMSC-032, at ¶ 23, 121 N.M. at 716, 917 P.2d at 1388.  Moreover, the Court concludes that the Supreme Court of New Mexico would recognize a cause of action for retaliation for internal safety complaints, because it indicated at least some willingness in Garrity v. Overland Sheepskin Co. of Taos, 1996-NMSC-032, at ¶ 23, 121 N.M. at 716, 917 P.2d at 1388, and because other states recognize, and certain federal laws include, a cause of action for retaliation for internal safety complaints, at least under certain circumstances.  See e.g., Kansas Gas & Elec. Co. v. Brock, 780 F.2d 1505, 1510-13 (10th Cir. 1985)(recognizing that the Energy Reorganization Act, 42 U.S.C. § 5851, protects an employee who files an internal safety or quality control complaint);

Driskell v. Summit Contracting Group, Inc., 828 F. App'x 858 (4th Cir. 2020)(noting that North Carolina recognizes a retaliation claim for internal complaints); Connolly v. State Highway Patrol, 271 Kan. 944, 974, 26 P.3d 1246 (concluding that the Kansas whistleblower statute protects state police "openly denouncing and protesting within their chain of command" illegal activities).  But see Ransom v. HBE Corp., 73 F. App'x 919, 921 (9th Cir. 2003)(noting that internal safety complaints do not fall within Oregon's whistleblower statute, because they were not "intended to or likely to result in notifying law enforcement"); Estate of Roach v. TRW, 164 N.J. 598, 552, 754 A.3d 544, 614-15 (noting that New Jersey's Conscientious Employee Protection Act law is "not intended to spawn litigation concerning the most trivial or benign employee complaints").  The Court must determine, therefore, whether Martin's actions "furthered some singularly public purpose or served primarily to benefit the private interest of the employer or employee."  Fierro v. Mesa Verde Enters., Inc., 244 F. Supp. 3d 1153 (D.N.M. 2007)(Herrera, J.).

Here, Martin identifies a clear mandate of public policy that he alleges APS violated.  The Court of Appeals of New Mexico recognizes that the NMOHSA provision that prohibits discrimination against employees for filing safety complaint constitutes a clear mandate of public policy for a retaliatory discharge claim's purposes.  See Weidler v. Big J. Enters., Inc., 1998-NMCA-021, ¶¶ 16-17, 124 N.M. 591, 597, 953 P.2d 1089, 1095.[47]  Martin made two safety

---

[47]The Court concludes that the Supreme Court of New Mexico would agree with the Court of Appeals of New Mexico's conclusion in Weidler v. Big J. Enters., Inc., 1998-NMCA-021, ¶¶ 16-17, 124 N.M. 591, 597, 953 P.2d 1089, 1095.  N.M.S.A. § 50-9-25 states:

> No person or employer shall discharge or in any manner discriminate against any employee because the employee has filed a complaint or instituted or caused to be instituted a proceeding under or related to the Occupational Health and Safety Act or has testified or is about to testify in any such proceeding or because of the exercise by the employee on behalf of himself or others of any right afforded by the Occupational Health and Safety Act.

complaints -- one in June, 2017, about the breaker room, <u>see</u> MSJ Memo ¶ 57, at 10; Martin Depo. at 121:14-122:15; <u>id</u>. at 129:10-132:5; Response at 5, and the other in October, 2017, about the welding cubicles, <u>see</u> MSJ Memo ¶ 69, at 12; Martin Depo. at 156:13-160:16; Response at 6.

Although Martin's complaints are protected activity for a retaliatory discharge claim, Martin does not show a causal connection between his complaints and his termination.  Martin asserts that there is a causal connection, because his "performance issues with his co-workers [did not start] until he voiced concerns about safety issues in the workplace," and because he was "upsetting the way things had been done and costing Defendant money to have a safer work place."  Reply at 13.  Martin made his most-recent safety complaint almost a year before APS fired him in September, 2018, however.   <u>See</u> MSJ Memo ¶ 69, at 12; Martin Depo. at 156:13-160:16. Moreover, Martin points to no evidence that his safety complaints related to his termination in any way, there is no dispute that Martin's safety complaints were not discussed in the meeting where APS decided to fire Martin, and there is no dispute that APS' decision to fire Martin did not involve any consideration of his safety complaints.   <u>See</u> MSJ Memo ¶ 51, at 9 (asserting this fact); Micatrotto Decl. ¶ 23, at 6.  The Court concludes, therefore, that APS did not retaliate against Martin for his safety complaints by firing Martin.

## IV.   MARTIN IS NOT ENTITLED TO BACK PAY OR FRONT PAY, BECAUSE HE HAS NOT MITIGATED REASONABLY HIS DAMAGES.

Fourth, APS argues that, if the Court does not grant summary judgment in its favor on all of Martin's claims, it should "grant summary judgment on Martin's claim for back pay and front

---

N.M.S.A. § 50-9-25(A).   NMOHSA states a clear mandate of public policy and provides an administrative remedy.   <u>See</u> N.M.S.A. § 50-9-25(B).   NMOHSA, therefore, constitutes a clear public policy mandate as <u>Shovelin v. Central New Mexico Elec. Co-op., Inc.</u>, 1992-NMSC-015, ¶ 25, 115 N.M. at 303, 850 P.2d at 1006, uses that term. Moreover, the Tenth Circuit, in <u>Cordova v. PNM Elec. And Gas Servs.</u>, 72 F. App'x 789, 793 (10th Cir. 2003), cited approvingly <u>Weidler v. Big J. Enters., Inc.</u>, 1998-NMCA-021, ¶¶ 16-17, 124 N.M. 591, 597, 953 P.2d 1089, 1095.

pay because Martin has not attempted to find alternate employment and has voluntarily removed himself from the workforce."  MSJ Memo at 27.  Once an employee proves discrimination, the employer bears the burden of uncertainty in damage calculation.  See Smith v. FDC Corp., 1990-NMSC-020, ¶ 22, 109 N.M. at 521, 787 P.2d at 440.  "Generally, a 'discharged employee must mitigate his or her damages by securing other employment if not reinstated by defendant.'" Gonzales v. New Mexico Dept. of Health, 2000-NMSC-20, ¶ 27, 129 N.M. at 596, 11 P.3d at 550, 560 (quoting Vigil v. Arzola, 1983-NMCA-082, ¶ 29, 102 N.M. at 690, 699 P.2d at 621).  A discharged employee is entitled to "full back pay so long as she makes a 'reasonable and good faith effort' to mitigate damages and find new employment."  Cordero Min. LLC v. Sec. of Labor ex rel. Clapp, 699 F.3d 1232, 1238 (10th Cir. 2012)(quoting Minshall v. McGraw Hill Broad. Co., 323 F.3d 1273, 1287 (10th Cir. 2003)).[48]  The "burden is on the employer to establish that the claimant did not exercise reasonable diligence."  Minshall v. McGraw Hill Broad. Co., 323 F.3d at 1287 (10th Cir. 2003).[49]

In his Complaint, Martin asks that the Court enter a judgment in his favor awarding him "compensatory damages that would make him whole for all earnings he would have received but for Defendant's discriminatory and unlawful treatment, including, but not limited to, wages, pension, and other benefits."  Complaint at 5.  APS contends that there is no genuine factual dispute that Martin has "not applied for any jobs since he was terminated by APS," and that therefore

---

[48]The Court predicts that the Supreme Court of New Mexico would agree with the Tenth Circuit's statement here, because the Supreme Court of New Mexico applies a reasonable diligence standard in damage mitigation in contract disputes.  See Bd. of Educ. of Alamogordo Pub. Sch. Dist. No. 1 v. Jennings, 1985-NMSC, ¶ 11, 102 N.M., 762, 765, 701, P.2d 361, 364.

[49]The Court predicts that the Supreme Court of New Mexico would agree with the Tenth Circuit's statement here, because the Supreme Court of New Mexico acknowledges that the employer bears the burden to prove that discharged employee did not mitigate his or her damages.  See Smith v. FDC Corp., 1990-NMSC-020, ¶ 22, 109 N.M. at 521, 787 P.2d at 440.

Martin "cannot recover back pay or front pay as a matter of law." MSJ Memo at 28. Martin asserts that he is entitled to back pay and front pay, because he has sought work since APS fired him. See Response at 13. Martin notes, however, that he has "not found suitable employment without moving from his home area" and that he "should not be punished because he is in his late 50's and wants to stay with his place of residence and not have to move for employment." Response at 13.

There is no dispute that Martin has not tried to mitigate his damages. Martin is not required to uproot his family and relocate to mitigate damages. See Minshall v. McGraw Hill Broad. Co., 323 F.3d at 1287-88 (10th Cir. 2003)(concluding that a discharged employee successfully mitigated damages despite choosing not to relocate his family). Nevertheless, Martin has not exercised reasonable diligence to find another position or otherwise mitigate his damages. Martin has looked for jobs comparable only to his APS job and has not applied to a single job since APS fired him.[50] See MSJ Memo ¶ 85, at 14; Martin Depo. at 173:20-174:7. Although the Court grants summary judgment in APS' favor on Martin's three claims, see Analysis I-III, supra, the Court also concludes that Martin has not tried reasonably to mitigate his damages. See Cordero Min. LLC v. Sec. of Labor ex rel. Clapp, 699 F.3d at 1238 (10th Cir. 2012)(concluding, among other things, that a defendant applied for one job successfully mitigated damages). The Court therefore enters judgment against Martin on his back pay and front pay claims, and also dismisses these claims on lack of mitigation grounds.

**IT IS ORDERED** that: (i) the Defendant's Motion for Summary Judgment, filed March 15, 2021 (Doc. 22), is granted; and (ii) judgment is entered in APS' favor on all of Martin's claims.

---

[50]At the hearing, APS stated that Martin's testimony indicates that he has applied for only one job since APS fired him, which does not meet the damage mitigation standard. See Tr. at 33:25-34:5 (Lynn). In the Martin Depo., however, Martin states that he has not applied to any jobs. See Martin Depo. at 174:3-5.

UNITED STATES DISTRICT JUDGE

Counsel:

Donald G. Gilpin
Christopher P. Machin
The Gilpin Law Firm, L.L.C.
Albuquerque, New Mexico

   *Attorneys for the Plaintiff*

Douglas Lynn
Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
Phoenix, Arizona

   *Attorneys for the Defendant*